UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
                                               :

DMITRIY KHMALADZE and ITADAPTER   :
CORPORATION INC.,                            :    Case No. 16-cv-8029
                                               :

                             Plaintiffs,   :
                                                :

           - against –                         :    **COMPLAINT**
                                               :

MIKHAIL VOROTYNTSEV, AUM CODE LLC, IT   :
ADAPTER LLC, and SHOPLINK INC.,                 :
                                               :

                             Defendants.   :
                                               :
------------------------------------------------------------------------ x

      Plaintiffs Dmitriy Khmaladze and ITAdapter Corporation Inc., by their undersigned

attorneys, as and for their Complaint against Defendants, hereby allege upon knowledge with

respect to their own acts and status, and upon information and belief with respect to all other

matters, as follows:

## PRELIMINARY STATEMENT

      1.     In 1998, Plaintiff Dmitriy Khmaladze, an experienced software architect and

computer programmer, began to conceive ideas for highly distributed system frameworks for

Internet servers – software that would allow multiple computer servers to work together to run

complex programs and provide users with a "cloud computing" or "software as a service"

experience – and for the programming frameworks that would allow this technology to work

with maximum efficiency and scalability.  Dmitriy worked on and refined his ideas for many

years, and eventually sought start-up funding to make his ideas a reality in the burgeoning

industry of e-commerce and Internet marketing.

      2.     In January 2013, Dmitriy was introduced to Defendant Mikhail Vorotyntsev, a

man with no commercially useful ideas of his own but with a talent for self-promotion and

deceit.  Vorotyntsev told Dmitriy a series of lies about how he was positioned to transform Dmitriy's technology into a bona fide business venture.  Vorotyntsev created an interlocking series of limited liability shell companies named after Dmitriy's own brand and software – Defendants IT Adapter LLC and Aum Code LLC – and induced Dmitriy to enter into agreements with and do business through them.  Vorotyntsev created this intercompany structure to prevent Dmitriy from having any ownership or control over the business exploitation of Dmitriy's ideas, and to keep Dmitriy in the dark about the true state of financial affairs of Vorotyntsev's own company, Defendant ShopLink Inc., which Vorotyntsev used to raise money from investors. Vorotyntsev fraudulently induced Dmitriy to convey his lucrative technology to Vorotyntsev and to enter into an unreasonable five-year non-competition covenant.  During the course of their relationship, Vorotyntsev repeatedly lied to Dmitriy about Vorotyntsev's efforts to grow the business and the significance of the documents that Vorotyntsev deceived Dmitriy into signing.

3.     Most egregiously, Vorotyntsev concealed from Dmitriy that he had induced investors to provide millions of dollars to ShopLink, using demonstrations and descriptions of Dmitriy's software, and that Vorotyntsev had then embezzled the money to support a lavish lifestyle for himself and his wife, rather than using the funds to develop Dmitry's technology and business idea.  Defendant Aum Code LLC also failed to transfer to Dmitry the consideration to which he was contractually entitled for the transfer of his technology to that company.

4.     After an investor in the business realized that Vorotyntsev had embezzled millions of dollars of invested funds for the personal use of Vorotyntsev and his wife, Vorotyntsev's scheme fell apart.  When Dmitriy learned of Vorotyntsev's misconduct, Dmitriy realized that he had been deceived into giving his ideas and software away for nothing, all so that Vorotyntsev could utilize them to perpetrate a fraud on investors.

5.      This action has been filed to undo Vorotyntsev's scheme against Dmitriy, and to restore to Dmitriy the intellectual property that Vorotyntsev tried to steal from him.

## THE PARTIES

6.      Plaintiff Dmitriy Khmaladze is a naturalized citizen of the United States who resides in Ohio.

7.      Plaintiff ITAdapter Corporation Inc. is an Ohio corporation with its principal place of business in Ohio.

8.      Defendant Mikhail Vorotyntsev is an individual who resides in New York County, New York.

9.      Defendant Aum Code LLC is a Delaware limited liability company.  It purports to have a place of business at 511 Avenue of the Americas, Suite 372, New York, New York 10011.  On information and belief, no member of Defendant Aum Code LLC, as of the date of the filing of this action, is a citizen of Ohio.

10.      Defendant IT Adapter LLC is a Delaware limited liability company.  It purports to have a place of business at 511 Avenue of the Americas, Suite 372, New York, New York 10011.  On information and belief, no member of Defendant IT Adapter LLC, as of the date of the filing of this action, is a citizen of Ohio.

11.      Defendant ShopLink Inc. is a Delaware corporation.  It purports to have its principal place of business at 511 Avenue of the Americas, Suite 372, New York, New York 10011.

## JURISDICTION AND VENUE

12.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a)(1), because the matter in controversy exceeds the sum or value of $75,000, exclusive

of interest and costs, and there is complete diversity of citizenship between the parties.

13.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants reside in this District for purposes of 28 U.S.C. § 1391(c), and pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## STATEMENT OF FACTS

14.     Plaintiff Dmitriy Khmaladze is a software architect and computer programmer. Originally from Odessa, Ukraine, he moved to the United States in 1993.  Starting in 2007, Dmitriy conducted his software and computer programming work through Plaintiff ITAdapter Corporation.

15.     Although he is an experienced, creative, and talented software architect, Dmitriy has minimal experience with legal documents, financial issues, or investment solicitation strategies.

16.     Beginning in 1998, Dmitriy conceived ideas for highly distributed system frameworks for Internet servers – software that would allow multiple computer servers to work together to run complex programs and provide users with a "cloud computing" or "software as a service" experience.  Over years of experimentation and development, Dmitriy put his ideas into practice.  Dmitriy's software implantation was particularly valuable because it would offer tremendous scalability (permitting the use of millions of servers in distributed processing) and efficiency.  Dmitriy named this distributed system framework "Aum."

17.     In the following years, Dmitriy conceived and developed a foundational programming framework to support his ideas; this open-source framework, which Dmitriy named "NFX," consisted of thousands of data structures organized into several software

libraries, with the capability of performing hundreds of functions necessary for the operation of

computer programs, including but not limited to the Aum distributed system framework.  NFX is

more tightly optimized and memory-efficient, with higher performance, than other similar

programming frameworks.

18.     Dmitriy also conceived another idea – the concept of "structured data tags,"

which he believed could be implemented in the NFX programming framework to run on the

Aum distributed system framework.  With this implementation, which would provide the concept

with extreme scalability for exponential increases in users, the "structured data tags" would

constitute unique identifiers ("data tags") and logic chains that would allow computers to process

and work with dynamic or variable facts without the need for the translation into and out of

regular text that Internet servers currently perform.  This technology would allow such

computers to correlate extremely large numbers of data streams in real time, and could have

major applications in, among other areas, e-commerce (sales of products online, such as through

social networks), in epidemiology and statistical analysis, and in the so-called "Internet of

things," the networking of physical devices (such as cars, houses and appliances) and their

interfaces with e-commerce platforms.

19.     In 2010, Dmitriy began contemplating an idea for a technology start-up.  The

start-up would develop and market Dmitriy's ideas, based on the concepts on which he had been

working since 1998.  Dmitriy's unique ideas would permit the coding of more efficient, more

scalable, and more tightly structured programs, which would perform better than other

competing products and have other commercial benefits.

20.     In January 2013, Dmitriy was introduced to Defendant Mikhail Vorotyntsev

("Vorotyntsev") and they began to discuss business ideas.  Dmitriy and Vorotyntsev first met

through Skype.  Dmitriy told Vorotyntsev that Dmitriy had a compelling idea for a start-up, for which he had already made significant progress, but that he needed investment to fund the further development of the ideas and software.  Dmitriy showed Vorotyntsev demonstration videos and brochures for his concepts and technologies.  Dmitriy also described, in general terms, the distributed system framework ideas on which Dmitriy had been working since 1998, and the idea of running a large system of this kind on a social network.

21.   Vorotyntsev told Dmitriy that Vorotyntsev and his company, ShopLink Inc. ("ShopLink"), would be very interested in working with Dmitriy on the software applications that Dmitriy had designed.  Vorotyntsev indicated that he was interested in the idea of using social-media network linking to permit celebrities and other consumers to monetize their product recommendations, in the manner of a multi-level marketing scheme such as Amway, Herbalife, or Tupperware.  Vorotyntsev's idea, which he called "ShopLink," was not sufficiently unique, original or capable of implementation to be commercially viable.  In November 2012, unbeknownst to Dmitriy, Vorotyntsev had filed a provisional patent application containing a general description of this idea, but the application was later rejected by the United States Patent and Trademark Office, and no patent has been issued on that application.

22.   Vorotyntsev also represented that he had substantial connections to various major investors and celebrities, including Beyoncé, Jay-Z and Demi Moore, and that he could leverage these relationships for product marketing.  He further represented that he had abundant sources of funding for start-up technology companies and that he had founded and invested in previous ventures.

23.   Vorotyntsev persuaded Dmitriy to join forces to develop Dmitriy's software by promising to provide multi-million-dollar funding from investors for the development of

Dmitriy's technology, enough to support a team of at least ten developers, as well as marketing, accounting and legal professionals.  He also promised Dmitriy that he would personally provide hundreds of thousands of dollars to fund the development of Dmitriy's software.

24.     Based on these false representations, which were made in January and February 2013, Dmitriy agreed to work with Vorotyntsev to further develop Dmitriy's software.  In February 2013, Vorotyntsev sent Dmitriy a non-disclosure agreement ("NDA") and induced Dmitriy to sign it.  The NDA purports to obligate Plaintiffs to keep confidential any proprietary information that ShopLink disclosed to Dmitriy for purposes of Plaintiffs' evaluation of entering into business with ShopLink.  However, in truth, it was Dmitriy and his company that disclosed their software and concepts to ShopLink.  Vorotyntsev falsely represented that Vorotyntsev intended to disclose valuable information to Dmitriy that would be useful in helping Dmitriy with the development of Dmitriy's software ideas.  A copy of the NDA, signed by Dmitriy but not Vorotyntsev, is attached hereto as Exhibit A.

25.     At that time, Dmitriy believed that Vorotyntsev was trying to help him develop the software and, at Vorotyntsev's urging, he agreed to re-name it "ShopLink" for marketing purposes.  He did not understand that Vorotyntsev's real plan was to try to co-opt Dmitriy's lucrative software ideas as his own.  Dmitriy, in reliance on his belief in Vorotyntsev's good intentions, continued to work on developing Aum and NFX.

26.     In February 2013, Vorotyntsev asked Dmitriy to start preparing patent applications for Dmitriy's ideas, which Vorotyntsev said that his attorneys would file with the government.  Vorotyntsev and his counsel told Dmitriy, who was not represented by his own counsel, that Vorotyntsev needed to be listed as a "co-inventor" in the applications.

27.     In reliance on the statements of Vorotyntsev, Dmitriy prepared text descriptions

for two patent applications in 2013 and 2014, and provided them to Vorotyntsev and his patent attorneys.  When filed, these patent applications listed Vorotyntsev as a "co-inventor" of Dmitriy's ideas.  One of the patent applications, unbeknownst to Dmitriy, purported to incorporate Vorotyntsev's November 2012 provisional patent filing, although the new application was far more detailed and commercially viable.  The other patent application was for Dmitriy's "structured data tags" idea, into which Vorotyntsev had had no input whatsoever.  The United States Patent and Trademark Office eventually published both applications, and later rejected both applications.  No patent has been issued on either application.

28.     Throughout the period of time between 2013 and 2016, Vorotyntsev repeatedly promised to provide multi-million-dollar funding for the continued development of the software that Dmitriy had been developing since 1998.  From the very beginning of their relationship, however, Vorotyntsev failed to provide basic funding, not even enough to support one programmer, claiming that he had not yet been successful in raising funds.  Instead, Vorotyntsev provided small sums on an irregular basis, which made it extremely difficult to continue development work on the project.  As a result, Dmitriy had to borrow money from his elderly parents in order to pay his mortgage and bills.  Vorotyntsev falsely told Dmitriy that Vorotyntsev was providing monies from his "personal" assets in order to fund development.  Upon information and belief, however, Vorotyntsev did not even have a personal bank account, and instead used ShopLink's bank account, containing funds provided by investors, for his personal expenses.

29.     In 2014, Dmitriy began work on a software program called "R7," which was based on Dmitriy's software architecture ideas, and which was intended to support the business concept of monetizing social-network links.  R7 was planned to be an e-commerce platform that

would keep track of purchases made by social-network users, track products available online, and even handle fulfillment of customer orders and other functionality.  Because available development resources were lacking, R7 was never completely implemented in the way that Dmitriy intended.

30.     In 2015, Vorotyntsev created an entity called "IT Adapter LLC."  Vorotyntsev told Dmitriy that Dmitriy should "shut down" his own "ITAdapter" corporation, founded in 2007, and commence doing business through bank accounts of the "IT Adapter LLC" entity that Vorotyntsev owned.  Dmitriy, who never had any employment or other contractual relationship with IT Adapter LLC, believed Vorotyntsev's representations that the change in structure was a mere formality.

31.     Later that year, in furtherance of his scheme to steal Dmitriy's technology, Vorotyntsev had his attorneys draft an asset purchase agreement (the "Asset Purchase Agreement"), which purported to transfer all the intellectual property belonging to Dmitriy and his company, ITAdapter Corporation Inc., to an entity formed by Vorotyntsev and called Aum Code LLC.  The Agreement also required Dmitriy to agree to an unreasonably burdensome noncompetition covenant that purported to prevent Dmitriy from competing in the business of "creating and developing software programs" for a period of five years after the supposed closing of the agreement.

32.     Dmitriy (who had no legal training and could not afford his own counsel) was reluctant to sign the draft Asset Purchase Agreement because he could not understand its terms.  On various dates in April 2015 and in the immediately preceding months, Vorotyntsev (who was represented by counsel) made a series of representations regarding matters collateral to the Asset Purchase Agreement itself, as inducements for Dmitriy to sign the Asset Purchase Agreement.

He represented that Aum Code LLC would have a formal "cross-licensing" agreement entitling Aum Code LLC to share in the profits of, and to have a 30% equity interest in, Vorotyntsev's company ShopLink Inc.  Vorotyntsev also promised that Aum Code LLC would provide Dmitriy with an employment package and benefits.  As an additional inducement, Vorotyntsev promised that any investor funds provided to ShopLink Inc. would be invested in the development and marketing of Dmitriy's software.  Vorotyntsev stated that, by conveying the technology to Aum Code LLC, Dmitriy would make it possible for ShopLink to utilize the technology in a way that would be profitable and beneficial to Dmitriy.  Vorotyntsev represented that he intended to retain marketing, accounting and legal professionals, who would maintain proper books and records, continue to prosecute the patents, design a proper website, and carry out other steps to enhance and protect the business.  And Vorotyntsev continued to assure Dmitriy that Vorotyntsev would be contributing his own money to the company.

33.     Dmitriy, without the benefit of counsel, believed Vorotyntsev.  But Vorotyntsev's representations were false.  Vorotyntsev knew that these representations were false when he made them, and he made these misrepresentations, with the intent that Dmitriy would rely on them, in order to induce Dmitriy to sign the asset purchase agreement.

34.     On or about April 18, 2015, in reliance on Vorotyntsev's false representations, Dmitriy executed the Asset Purchase Agreement.  A true and correct copy of the Asset Purchase Agreement is attached hereto as Exhibit B.

35.     On or about April 29, 2015, in reliance on Vorotyntsev's false representations, Dmitriy signed an "intellectual property assignment" and "bill of asset transfer" that purported to effectuate the Asset Purchase Agreement.  True and correct copies of these documents are attached hereto as Exhibits C and D.

36.     Although, by its own terms, the Asset Purchase Agreement required a formal closing, no closing ever took place.  No operating agreement for Aum Code LLC was ever provided to Dmitriy, and no membership interest in Aum Code LLC was ever conveyed to Dmitriy, whether evidenced in the manner called for by the Asset Purchase Agreement (i.e. as a schedule to the non-existent Aum Code LLC operating agreement that was to be delivered to Dmitriy) or otherwise.  Upon information and belief, no membership records of Aum Code LLC were ever created or maintained, and Dmitriy was never listed as a member of Aum Code LLC in its records.  Indeed, no later than June 1, 2015, Aum Code LLC ceased to be in good standing under the laws of the State of Delaware.  Dmitriy has never received any consideration under the Asset Purchase Agreement in exchange for his purported assignment of his software and technology.

37.     In addition, all of Vorotyntsev's collateral representations were false. Vorotyntsev never provided Dmitriy with an employment agreement from any of Vorotyntsev's entities, much less the "employment package" and benefits that Vorotyntsev had promised.  On information and belief, Aum Code LLC never received a "cross-licensing" agreement entitling Aum Code LLC to share in the profits of, and to have a 30% equity interest in, ShopLink.  On information and belief, no contractual or ownership relationship exists, or has ever existed, between Aum Code LLC and ShopLink Inc.  Certainly, no such contractual or ownership relationship between Aum Code LLC and ShopLink Inc., if one does exist, has ever been disclosed to Dmitriy.  Until the end of August 2016, neither Aum Code LLC nor Vorotyntsev's other entities ever retained the proper marketing, accounting or legal professionals that Vorotyntsev had promised, and the entities did not maintain accounting books and records or a proper website, contrary to Vorotyntsev's promises.  Moreover, as set forth below, Vorotyntsev

11

did not provide investor funds raised by ShopLink for the purpose of funding the development of Dmitriy's software and ideas.  To the contrary, because Vorotyntsev misappropriated investor funds for himself and his wife, the business was left without sufficient funds to meet its expenses, such as the legal fees for attorneys to prosecute the patent applications that Dmitriy had prepared or authorized.

38.     Dmitriy continued to work on developing his technology and he continually pressed Vorotyntsev about funding this development.  Vorotyntsev provided only minimal and insufficient funds to support the development, causing Dmitriy and his wife to face significant financial challenges.

39.     By July 2015, Dmitriy had begun searching for a new job.  Vorotyntsev begged Dmitriy to stay and promised him that he would get real funding within the next two months, enough to cover his work "four times over."  In October 2015, Dmitriy was again on the verge of taking another job, and Vorotyntsev made further misrepresentations purporting to show that Vorotyntsev and ShopLink had substantial funds available to support further development. Dmitriy elected to forgo other opportunities for the time being and to give Vorotyntsev another chance.

40.     Upon information and belief, in the period between the beginning of 2014 and the beginning of 2016, Vorotyntsev received approximately $1.83 million in funding for ShopLink from various investors.  Vorotyntsev never told Dmitriy the full extent of the funds that investors had provided to invest in the technology that Dmitriy had conceived and developed.

41.     Upon information and belief, in April 2016 and August 2016, Vorotyntsev received a total of about $1,348,200 in funding for ShopLink from another investor, Gary Tatintsian.  From time to time during 2016, Vorotyntsev informed Dmitriy of Tatintsian's

investments, but, despite Dmitriy's requests, Vorotyntsev never disbursed enough of the invested funds to continue development of Dmitriy's technology. Instead, Vorotyntsev converted those funds to pay the lavish personal expenses of himself and his wife.

42. Upon information and belief, in late August 2016, Tatintsian accused Vorotyntsev of looting ShopLink and using Tatintsian's investment to support his own lavish lifestyle, and that of his wife. Vorotyntsev informed Dmitriy that Tatintsian might sue, but concealed the nature of Tatintsian's claims from Dmitriy and claimed that Tatintsian was "crazy."

43. On information and belief, Vorotyntsev knew it was only a matter of time before Dmitriy learned of Vorotyntsev's fraudulent conduct and would no longer work with Vorotyntsev as a result, and so Vorotyntsev wanted to immediately take control of Dmitriy's intellectual property. For example, after Tatintsian accused Vorotyntsev of fraud and embezzlement, but before Dmitriy learned the truth about Vorotyntsev, Vorotyntsev asked Dmitriy to execute purported assignments to ShopLink and Aum Code LLC of all of Dmitriy's interest in the two earlier patent applications. Vorotyntsev told Dmitriy that these documents were mere "paperwork" "needed by the lawyers," and that they were entirely ministerial in nature. In order to induce Dmitriy to execute the assignments, Vorotyntsev knowingly concealed from Dmitriy the true state of affairs with ShopLink, Tatintsian's accusations, and Vorotyntsev's own intentions for Dmitriy's technology and the investors' funds. Vorotyntsev also reiterated his promises to provide multi-million-dollar funding from investors and his personal funds for the development of Dmitriy's software and technology.

44. Dmitriy, who was still unaware of Vorotyntsev's scheme and who was still unrepresented by his own counsel, complied with his request and executed the assignment agreements on September 2, 2016. True and correct copies of the assignment agreements, signed

13

by Dmitriy but not by Vorotyntsev, are attached hereto as Exhibits E and F.

45.     On or about September 9, 2016, Tatintsian spoke with Dmitriy.  In that conversation, Dmitriy learned for the first time that Tatintsian's conflict with Vorotyntsev arose from the fact that Vorotyntsev had embezzled millions of dollars from Tatintsian and other investors in ShopLink.  Dmitriy learned that Vorotyntsev had in fact raised millions of dollars from investors but, rather than investing this money into the company and the development of Dmitriy's technology, as he had promised Dmitriy, Vorotyntsev had used that money on lavish luxury apartments, goods, and services for himself and his wife.  Dmitriy learned that Vorotyntsev had provided his wife with a debit card to purchase luxury goods and services using funds in the ShopLink bank account, even though she had no business role within the company and had no connection to the development of Dmitriy's technology, and that both Vorotyntsev and his wife had treated the funds contributed by investors as their own personal funds.

46.     Dmitriy thus realized that Vorotyntsev had been lying to him for years. Vorotyntsev had claimed to encounter difficulties raising sufficient investments to develop the technology and grow the business, and forced Dmitriy to pay his own family's living expenses with personal savings and the savings of his elderly parents.  In reality, Vorotyntsev had raised millions of dollars, but had diverted these investments for his and his wife's personal use, rather than deploy these investments to grow the business, develop the technology, or adequately pay Dmitriy.

### FIRST CLAIM FOR RELIEF
### (Rescission of Asset Purchase Agreement Based On Fraudulent Inducement Against Defendants Aum Code LLC and Vorotyntsev)

47.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

48.     As set forth above, in April 2015 and the months beforehand, Defendants made material misrepresentations to Plaintiffs, including that any funds raised from investors would be utilized to support the development and marketing of Plaintiffs' software; that, by conveying the technology to Aum Code LLC, Plaintiffs would make it possible for ShopLink to utilize the technology in a way that would be profitable and beneficial to them; that Aum Code LLC would have a formal "cross-licensing" agreement entitling Aum Code LLC to share in the profits of, and to have an equity interest in, ShopLink Inc.; and that Dmitriy would be provided with an employment package and benefits.

49.     Defendants knew that these representations were false at the time they made them.

50.     Defendants intended to induce Plaintiffs to rely on Defendants' misrepresentations and to enter into the Asset Purchase Agreement.

51.     Plaintiffs' reliance on the misrepresentations was justified.

52.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs entered into the Asset Purchase Agreement.

53.     As a result of Defendants' misrepresentations, Plaintiffs are entitled to rescind the Asset Purchase Agreement, and the Intellectual Property Assignment and the Bill of Transfer that were executed and incorporated into the Asset Purchase Agreement as exhibits thereto, and the parties should be returned to the pre-contract status quo.

54.     Plaintiffs have no adequate remedy at law.

## SECOND CLAIM FOR RELIEF
### (Rescission of Asset Purchase Agreement Based On Failure of Consideration Against Defendants Aum Code LLC and Mikhail Vorotyntsev)

55.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

56.     The sole consideration that Defendant Aum Code LLC owed to Plaintiffs under the Asset Purchase Agreement was to transfer a 40% membership interest in Aum Code LLC to Plaintiffs.  To effectuate this transfer, Section 8.3(a) of the Asset Purchase Agreement required Aum Code LLC to have an operating agreement with a "Schedule A" establishing the membership interests in Aum Code LLC, which was required to be delivered to Plaintiffs.  No such operating agreement and Schedule A were ever provided to Plaintiffs, and no membership interest in Aum Code LLC, evidenced in the manner called for by the Asset Purchase Agreement or otherwise, was ever conveyed to Plaintiffs.  Upon information and belief, no membership records of Aum Code LLC were ever created or maintained, and Plaintiffs were never listed as members of Aum Code LLC in its records.

57.     No closing ever took place under the Asset Purchase Agreement.

58.     In violation of the representations and warranties set forth in the Asset Purchase Agreement, Aum Code LLC ceased to be in good standing under the laws of the State of Delaware prior to any closing taking place.

59.     Aum Code LLC's failure to perform its sole contractual obligation under the Asset Purchase Agreement has defeated the purpose of the contract.

60.     As a result of Aum Code LLC's failure, Plaintiffs are entitled to rescind the Asset Purchase Agreement, and the Intellectual Property Assignment and the Bill of Transfer that were executed and incorporated into the Asset Purchase Agreement as exhibits thereto, and the parties should be returned to the pre-contract status quo.

61.     Plaintiffs have no adequate remedy at law.

**THIRD CLAIM FOR RELIEF**
**(Rescission of NDA Based On Fraudulent Inducement Against Defendants ShopLink Inc.
and Vorotyntsev)**

62.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

63.     As set forth above, in January and February 2013, Defendants falsely represented
to Plaintiffs (who did not understand the terms of the NDA and were not represented by their
own counsel) that Defendants possessed valuable ideas worthy of confidentiality protection.
Defendants falsely represented that Plaintiffs did not require additional confidentiality protection
for Plaintiffs' own ideas and software, and that Plaintiffs were adequately protected by the
provisions of the NDA propounded by Defendants.  Defendants also falsely represented that they
would provide millions of dollars in funding to develop Plaintiffs' technology if Plaintiffs
entered into the NDA and disclosed their ideas and technology to Defendants.

64.     Defendants knew that these representations were false at the time they made
them.

65.     Defendants intended to induce Plaintiffs to rely on Defendants'
misrepresentations and to enter into the NDA.

66.     Plaintiffs' reliance on Defendants' misrepresentations was justified.

67.     As a direct and proximate result of Defendants' misrepresentations, Plaintiffs
entered into the NDA.

68.     As a result of Defendants' misrepresentations, Plaintiffs are entitled to rescind the
NDA, and the parties should be returned to the pre-contract status quo.

69.     Plaintiffs have no adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**(Rescission of Patent Application Assignment Agreements Based On Fraudulent**
**Inducement Against Defendants Aum Code LLC, ShopLink Inc. and Vorotyntsev)**

70.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

71.     As set forth above, on or about September 2, 2016 and in the days immediately beforehand, Defendants represented to Dmitriy (who was not represented by his own counsel), among other things, that Tatintsian was "crazy"; that Tatintsian's allegations of fraud were unfounded; and that execution of the patent application assignment agreements would be beneficial for Dmitriy.  Defendants also reiterated their representations that they would provide multi-million-dollar funding from investors and Vorotyntsev's personal funds for the development of Dmitriy's software and technology.

72.     Defendants knowingly omitted the material facts that Vorotyntsev had looted the business and diverted funds intended for investment of Dmitriy's software and technology, and that Tatintsian's allegations were substantially true.

73.     Defendants knew that these material representations were false at the time they made them.

74.     Defendants intended to induce Dmitriy to rely on Defendants' material misrepresentations and to enter into the patent application assignment agreements.

75.     Dmitriy's reliance on Defendants' misrepresentations was justified.

76.     As a direct and proximate result of Defendants' misrepresentations, Dmitriy entered into the patent application assignment agreements on or about September 2, 2016.

77.     As a result of Defendants' misrepresentations, Dmitriy is entitled to rescind the patent application assignment agreements, and the parties should be returned to the pre-contract status quo.

78.     Dmitriy has no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**
**(In the Alternative)**
**(Declaratory Judgment of Material Breach of Asset Purchase Agreement Against Defendant Aum Code LLC)**

79.     In the alternative, Plaintiffs repeat and reallege Paragraphs 1 to 46 of the Complaint as if fully set forth herein.

80.     In the alternative, a valid and enforceable agreement existed between Plaintiffs and Defendant Aum Code LLC.

81.     In the alternative, Plaintiffs fully performed their obligations under the Asset Purchase Agreement.

82.     Under the Asset Purchase Agreement, Defendant Aum Code LLC was required to transfer a 40% interest in Aum Code LLC to Plaintiffs.  To effectuate this transfer, Section 8.3(a) of the Asset Purchase Agreement required Aum Code LLC to have an operating agreement with a "Schedule A" establishing the membership interests in Aum Code LLC, which was required to be delivered to Plaintiffs.

83.     No such operating agreement and Schedule A were ever provided to Plaintiffs, and no membership interest in Aum Code LLC, evidenced in the manner called for by the Asset Purchase Agreement, was ever conveyed to Plaintiffs.  Upon information and belief, no membership records of Aum Code LLC were ever created or maintained, and Plaintiffs were never listed as members of Aum Code LLC in its records.

84.     No closing ever took place under the Asset Purchase Agreement.

85.     In violation of the representations and warranties set forth in the Asset Purchase Agreement, Aum Code LLC ceased to be in good standing under the laws of the State of Delaware prior to any closing taking place.

86.     In the alternative, by reason of the events alleged in the foregoing Paragraphs of the Complaint, one or more "Material Adverse Effects," as defined in the Asset Purchase Agreement, have occurred, and a "condition to closing," set forth in section (a) of Article VII of the Asset Purchase Agreement, has been violated, preventing any closing of the Asset Purchase Agreement.

87.     Defendant contends that it has not materially breached the Asset Purchase Agreement and that Plaintiffs are bound by the Asset Purchase Agreement.

88.     Plaintiffs contend that Defendant has materially breached the Asset Purchase Agreement and that Plaintiffs are not bound by the Asset Purchase Agreement.

89.     Accordingly, an actual, present and justiciable controversy has arisen between Plaintiffs and Defendants concerning the enforceability of Plaintiffs' obligations under the Asset Purchase Agreement and the ancillary documents executed in connection therewith.

90.     By reason of the foregoing, Plaintiffs are entitled to a judgment declaring that Defendant Aum Code LLC materially breached its contractual obligations under the Asset Purchase Agreement, and that Plaintiffs therefore have no further obligations to perform their contractual obligations under the Asset Purchase Agreement, including but not limited to Section 5.1 ("Agreement Not to Compete or Solicit, and to Maintain Confidentiality") and Section 6.7 ("Confidentiality") of the Asset Purchase Agreement, and the ancillary documents executed in connection therewith.

## SIXTH CLAIM FOR RELIEF
### (In the Alternative)
### (Declaratory Judgment of Non-Enforceability of Non-Competition and Non-Solicitation Covenants in Asset Purchase Agreement)

91.     In the alternative, Plaintiffs repeat and reallege Paragraphs 1 to 46 of the Complaint as if fully set forth herein.

92.     Section 5.1 ("Agreement Not to Compete or Solicit, and to Maintain Confidentiality) of the Asset Purchase Agreement purports to restrict Plaintiffs from engaging in "a business substantially similar to or competitive with the Business," from solicitation of customers of "the Business," and from disclosing, using or exploiting all of Plaintiffs' "technical, commercial, marketing, strategic, business or other information, data, plans and material of the kind either identified as confidential or proprietary or which a reasonable person would recognize to be confidential or proprietary, either from its nature of the manner of its disclosure" without the prior written consent of Aum Code LLC.  The Asset Purchase Agreement defines "Business" to mean "the business of creating and developing software programs . . . as conducted by IT Adapter Corporation Inc."

93.     Section 5.1 is not restricted with respect to geographic scope, and lasts for a period of five years from the "Closing Date" as defined the Asset Purchase Agreement.

94.     Section 5.1 is unreasonably unrestricted with respect to time and geographical scope, and unreasonably vague and overbroad with respect to the substantive scope of the "Business" restricted.

95.     Section 5.1 is not reasonably calculated to protect the legitimate business expectations of Aum Code LLC in connection with the transaction set forth in the Asset Purchase Agreement.

96.     The "Purchase Price" referenced in Section 5.1(b) of the Asset Purchase Agreement was never paid by Aum Code LLC.

97.     In addition, no "Closing Date" as defined under the Asset Purchase Agreement ever took place.

98.     Defendants contend that Plaintiffs are bound by Section 5.1 of the Asset Purchase Agreement.

99.     Plaintiffs contend that they are not bound by Section 5.1 of the Asset Purchase Agreement.

100.    Accordingly, an actual, present and justiciable controversy has arisen between Plaintiffs and Defendants concerning the enforceability of Section 5.1 of the Asset Purchase Agreement.

101.    By reason of the foregoing, Plaintiffs are entitled to a judgment declaring that Section 5.1 ("Agreement Not to Compete or Solicit, and to Maintain Confidentiality") of the Asset Purchase Agreement is void and unenforceable.

## SEVENTH CLAIM FOR RELIEF
### (Declaratory Judgment for Plenary Relief)

102.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

103.    Defendants claim that Aum Code LLC is the owner of the intellectual property that Dmitriy created and that is the subject of the Asset Purchase Agreement, that Vorotyntsev is a co-inventor of all of the intellectual property that Dmitriy created, that Plaintiffs are bound by the NDA, and that the September 2, 2016 assignments of the patent applications to ShopLink are valid and binding.

104.    Plaintiffs contend that they are rightful owners of the intellectual property created by Dmitriy because the Asset Purchase Agreement was procured by fraud and Aum Code LLC failed to provide any consideration under the Asset Purchase Agreement, such that the Asset Purchase Agreement should be rescinded.  For similar reasons, Plaintiffs contend that the NDA and patent application assignment agreements should be rescinded.

105.     Accordingly, an actual, present and justiciable controversy has arisen between Plaintiffs and Defendants concerning Plaintiffs' contractual obligations and the ownership of the subject intellectual property.

106.     By reason of the foregoing, Plaintiffs are entitled to a declaration that (a) all intellectual property purported to be assigned by Plaintiffs to Aum Code LLC pursuant to the Asset Purchase Agreement is the intellectual property of Plaintiffs; (b) the NDA is void and unenforceable; (c) the September 2, 2016 patent application assignments are void and unenforceable; (d) Dmitriy Khmaladze is the sole and exclusive owner of the NFX, Aum, and R7 software; and (e) Plaintiffs have no further obligations to Defendants in connection with the ownership, control, licensing, exploitation or other use of the intellectual property developed by Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands entry of judgment against Defendants as follows:

(a)     On the First Claim for Relief Against Defendant Aum Code LLC, rescission of the Asset Purchase Agreement, and the Intellectual Property Assignment and the Bill of Transfer that were executed and incorporated into the Asset Purchase Agreement as exhibits thereto;

(b)     On the Second Claim for Relief against Defendant Aum Code LLC, rescission of the Asset Purchase Agreement, and the Intellectual Property Assignment and the Bill of Transfer that were executed and incorporated into the Asset Purchase Agreement as exhibits thereto;

(c)     On the Third Claim for Relief against Defendants ShopLink Inc. and

Vorotyntsev, rescission of the NDA;

(d)     On the Fourth Claim for Relief against Defendants Aum Code LLC, ShopLink Inc. and Vorotyntsev, rescission of the September 2, 2016, patent application assignment agreements;

(e)     On the Fifth Claim for Relief, in the alternative, against Defendant Aum Code LLC, a declaration that Defendant Aum Code LLC materially breached its contractual obligations under the Asset Purchase Agreement, and that Plaintiffs therefore have no further obligations to perform their contractual obligations under the Asset Purchase Agreement, including but not limited to Section 5.1 ("Agreement Not to Compete or Solicit, and to Maintain Confidentiality") and Section 6.7 ("Confidentiality") of the Asset Purchase Agreement;

(f)     On the Sixth Claim for Relief, in the alternative, against all Defendants, a declaration that Section 5.1 ("Agreement Not to Compete or Solicit, and to Maintain Confidentiality") of the Asset Purchase Agreement is void and unenforceable;

(g)     On the Seventh Claim for Relief, against all Defendants, a declaration that (i) all intellectual property purported to be assigned by Plaintiffs to Aum Code LLC pursuant to the Asset Purchase Agreement is the intellectual property of Plaintiffs; (ii) the NDA is void and unenforceable; (iii) the September 2, 2016 patent application assignments are void and unenforceable; (iv) Dmitriy Khmaladze is the sole and exclusive owner of the NFX, Aum, and R7 software; and (v) Plaintiffs have no further obligations to Defendants in connection with the ownership, control, licensing, exploitation or other use of the intellectual property developed by Plaintiffs;

(h)     An award to Plaintiffs of their reasonable attorneys' fees and costs; and

(i)     An award to Plaintiffs of such other and further relief as this Court may

deem just and proper.

Dated: New York, New York
       October 13, 2016

                      ALLEGAERT BERGER & VOGEL LLP

                      By: _____s/ Partha P. Chattoraj_____
                              Partha P. Chattoraj

                              111 Broadway, 20th Floor
                              New York, New York 10006
                              (212) 571-0550
                              pchattoraj@abv.com

                        *Attorneys for Plaintiffs Dmitriy Khmaladze and ITAdapter*
                        *Corporation, Inc.*