UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/6/2024
```

------------------------------------------------------------------ X
                                                        :
DMITRY KHMALADZE, *et al.*,                             :
                                                        :
                                    Plaintiffs,         :          1:16-cv-8029-GHW
                                                        :
                       -v —                             :       MEMORANDUM OPINION &
                                                        :               ORDER
MIKHAIL VOROTYNTSEV, *et al.*,                          :
                                    Defendants.         :
                                                        :
------------------------------------------------------------------ X
GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

In 2013, Mikhail Vorotyntsev, an entrepreneur, and Dmitry Khmaladze, a software developer, began a volatile business relationship. Over the next three years—as Mr. Vorotyntsev clashed with his investors and lawyers, Mr. Khmaladze clashed with other software developers, and Mr. Vorotyntsev and Mr. Khmaladze clashed with each other—Mr. Khmaladze worked to bring Mr. Vorotyntsev's vision for an e-commerce platform to fruition. The project was never completed. Mr. Khmaladze jumped ship to form another ill-fated company with one of Mr. Vorotyntsev's investors. Mr. Khmaladze sued Mr. Vorotyntsev and his companies, seeking, among other things, rescission of a contract pursuant to which he transferred ownership of his proprietary software to Mr. Vorotyntsev's company. Mr. Vorotyntsev responded with a slew of counterclaims primarily grounded in the theory that Mr. Khmaladze and his new business partner had stolen Defendants' ideas, technology, and investors.

Plaintiffs now move for summary judgment on their claims and all of Defendants' counterclaims. Defendants point to evidence of animosity, threats of violence by an investor, and shattered relationships. However, they have failed to point to evidence that raises a genuine dispute of material fact with respect to most of Plaintiffs' claims or Defendants' counterclaims.

Accordingly, Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part.

## II.    BACKGROUND

### A.  Shoplink's Beginnings

Mr. Vorotyntsev formed Shoplink, Inc. ("Shoplink") in May 2012 in Delaware.  Dkt. No. 267 ("Vorotyntsev Affidavit") at 4.  His vision for Shoplink was that the company would develop an online platform that would allow users to purchase products "[t]hrough recommendations."  Dkt. No. 265-2 ("Vorotyntsev Dep. II") 50:23–51:2.  After incorporating Shoplink in Delaware, Mr. Vorotyntsev began pitching his idea to investors and seeking software engineers to execute it. Vorotyntsev Affidavit at 4–5.

In early 2013, Mr. Vorotyntsev met Mr. Khmaladze.  Vorotyntsev Affidavit at 5.  Mr. Khmaladze is the Chief Executive Officer ("CEO") and sole shareholder of ITAdapter Corporation, Inc. ("ITAdapter Corp.").  Dkt. No. 265-5.  ITAdapter Corp. and Shoplink entered into a non-disclosure agreement.  Dkt. No. 265-4 (the "NDA").  The NDA stated that "Shoplink has developed software for a unified communication platform currently branded as 'Shoplink' (the 'Software Concept') and is seeking software developers for the development and exploitation of such concept."  NDA § A.  Among other things, the NDA prohibited Mr. Khmaladze and ITAdapter Corp. from disclosing confidential information about Shoplink to third parties.  *Id.* § 5. The NDA also included a restrictive covenant that prohibited them from using Shoplink's "Software Concept" without Shoplink's participation.  *Id.*

Mr. Vorotyntsev then provided Mr. Khmaladze with a white paper and provisional patent application related to his concept for Shoplink.  Vorotyntsev Dep. II 46:2–18.  Mr. Vorotyntsev testified that he also shared other "ideas and trade secrets" with Mr. Khmaladze.  *Id.*  Defendants have not elaborated upon the nature of those "ideas and trade secrets."

### B. Mr. Khmaladze's Employment Arrangement

The following month, Mr. Vorotyntsev hired Mr. Khmaladze to develop software for Shoplink. Vorotyntsev Affidavit at 5–6. He did so because of Mr. Khmaladze's "superior knowledge and expertise in system frameworks for Internet servers." Dkt. No. 37 ("AUM Code Counterclaims") ¶ 131. No party has produced a written work for hire, employment agreement, or contract for hire agreement between Mr. Khmaladze and any of the defendants. Dkt. No. 265 ("Chattoraj Decl.") at 2–3. Mr. Khmaladze considered himself to be an independent contractor for IT Adapter LLC. Dkt. No. 265-3 ("Khmaladze Dep.") 321:1–16.

Mr. Khmaladze worked from his home in Ohio. Khmaladze Dep. 209:22–210:21. Mr. Vorotyntsev "encourage[d]" Mr. Khmaladze to hire a team of software developers to assist him. *Id.* Though Mr. Khmaladze initially declined to hire any other developers, he soon began working with Serge Aleynikov, who "famously went to jail for a year," and Dennis Latushkin. *Id.* Ultimately, Mr. Khmaladze had arguments with both developers and "pushed [them] out." *Id.* at 6, 10. By March 2016, Mr. Khmaladze had hired a team of four developers whom he "forcefully segregated . . . from any contact with" Mr. Vorotyntsev. Vorotyntsev Affidavit at 12. Throughout, Mr. Khmaladze was responsible for "managing relationships with developers" as well as managing their payment. Vorotyntsev Dep. II 86:5-15, 93:18-94:9.

For compensation, Mr. Vorotyntsev and Mr. Khmaladze agreed that Mr. Khmaladze "would receive a set salary and 12% equity stake." Vorotyntsev Affidavit at 5. Mr. Khmaladze "would take the minimum needed to pay his bills and the remainder of the salary would become accrued compensation, payable once they raised more money." *Id.* Mr. Khmaladze withdrew that money from an account owned by IT Adapter LLC. Vorotyntsev Dep. I 185:16–18. Mr. Khmaladze also received additional perks: "Mikhail wanted Dmitry to be comfortable so he could produce, so Shoplink paid for everything in DK's life, on top of his salary. Shoplink paid for new car for DK's

wife, all the [sic] DK's house remodeling . . . . Shoplink also paid for DK's vacations out of the US, to Mexico and Ukraine, and for DK's and his wife's parents [sic] medical needs and support in Ukraine, amongst other things."  Vorotyntsev Affidavit at 8.

Between 2013 and 2016, Mr. Khmaladze received $300,000 from Defendants.  *Id.* at 5.  No payroll taxes or other employment deductions were withheld from the money he received during his relationship with Defendants, and Defendants did not pay any payroll or other taxes in connection with Mr. Khmaladze's compensation.  Vorotyntsev Dep. II 64:5–13; Chattoraj Decl. ¶ 16. Defendants also did not issue him a Form W-2 or 1099.  Vorotyntsev Dep. II 88:2–9; Chattoraj Decl. ¶ 17; Vorotyntsev Dep. I at 186:4–25; Chattoraj Decl. ¶ 18.

### C.  The Shoplink Patent

In late 2013, Mr. Khmaladze and Mr. Vorotyntsev worked with a lawyer to prepare and file a patent application for Shoplink.  Dkt. No. 265-24.  The patent application was made publicly available in July 2014.  Dkt. No. 36 ("Shoplink Counterclaims") ¶ 27; Dkt. No. 37 ("Aum Code Counterclaims") ¶ 27.  The U.S. Patent and Trademark Office (the "U.S.P.T.O.") rejected the application in June 2016 because it "[did] not amount to significantly more than [an] abstract idea." Dkt. No. 265-25 at 4 (letter from the U.S.P.T.O.)  The U.S.P.T.O. also determined that the claims in the patent were not patentable over existing patents.  *Id.* 6–14.

### D.  Shoplink Pilot Development

Mr. Khmaladze based the software he created for the Shoplink platform on his "proprietary codebase."  Vorotyntsev Affidavit at 6.  He "insisted" on using his own software rather than "off-the-shelf code" and on using the programming the language C#, "not Java or any other language." *Id.*

In late 2013, Mr. Vorotyntsev acquired 65% ownership in ReStore Energy, a "diabetes energy drink" company, and hoped that it could be the first company to have its products displayed

4

on Shoplink's platform, as a pilot. *Id.* at 7. Mr. Khmaladze "promise[d]" to complete a Shoplink

pilot for ReStore energy by the summer of 2014. *Id.* But that fall, he told Mr. Vorotyntsev that it

would be a better use of time to continue developing the underlying technology for Shoplink, and

Mr. Vorotyntsev, though "frustrated," agreed. *Id.*

In 2015, Mr. Khmaladze and Mr. Vorotyntsev had a fight about a Shoplink investor.

Vorotyntsev Affidavit at 10. Mr. Khmaladze temporarily stopped working for Defendants. *Id.* He

got back in touch in October 2015 and "t[old] [Mr. Vorotyntsev] they w[ould] have a pilot by May

2016." *Id.* In May 2016, Mr. Khmaladze delivered "the first crude operational version of

ShopLink," incorporating Mr. Khmaladze's proprietary codebase and the code subsequently

developed by Mr. Khmaladze and his team of software developers. *Id.* at 14.

### E. The Asset Purchase Agreement

In April 2015, in the midst of developing the pilot, Mr. Vorotyntsev formed AUM Code

LLC ("AUM Code") for the purpose of acquiring all of the intellectual property owned by

ITAdapter Corp. that Mr. Khmaladze was using to develop the pilot. Dkt. No. 265-7. AUM Code

and its subsidiary, IT Adapter LLC, are Delaware limited liability corporations. AUM Code

Counterclaims ¶¶ 9, 10.

Mr. Vorotyntsev and Mr. Khmaladze then signed a contract (the "Asset Purchase

Agreement"), on behalf of AUM Code and ITAdapter Corp., respectively, to effectuate the

acquisition. Dkt. No. 265-7 ("APA"). Shoplink and IT Adapter LLC were not parties to the

agreement. *Id.*

The Asset Purchase Agreement provided that Mr. Khmaladze would transfer "substantially

all of the assets" of ITAdapter Corp. that Mr. Khmaladze was using to develop the Shoplink pilot,

including hardware, software, and intellectual property, to AUM Code. *Id.* Premises. It

incorporated an assignment agreement and bill of transfer through which Mr. Khmaladze was to

execute those transfers.  APA § ii.  The contract defined the "Purchase Price" for all of the assets to be transferred to AUM Code as "a number of Class A Units equal to 40% of the outstanding membership units of [AUM Code] . . . ."  *Id.* § 2.3.  Elsewhere in the contract, the Purchase Price was defined as "the consideration payable to Seller for the Assets as provided in Section 2.33."  *Id.* § 1.1.

The Asset Purchase Agreement also required Mr. Khmaladze to refrain from business "substantially similar or competitive with the Business," to "induce or attempt to persuade any Customer of the Business to terminate such relationship," or to share confidential information with third parties.  *Id.* § 5.  The contract defined the "Business" as ITAdapter Corp.'s business of "creating and developing software programs."  *Id.* Premises.

The Asset Purchase Agreement contained an integration clause and limited amendments to those made in writing.  Section 10.6 of the Asset Purchase Agreement stated that the agreement "supersede[d] all prior negotiations and understandings between the parties."  *Id.* § 10.6.  Section 10.7 required that any amendment to the agreement be "by an agreement in writing, which makes specific reference to this Agreement or an agreement delivered pursuant hereto . . . and which is signed by the party against which enforcement" of the amendment was sought.  *Id.* § 10.7.

In December 2015, Mr. Vorotyntsev's lawyer, Edward Zahos, emailed Mr. Vorotyntsev and Mr. Khmaladze a draft addendum to the Asset Purchase Agreement (the "Draft Addendum").  Dkt. No. 265-10; Vorotyntsev Dep. II 57:20–60:9.  The email stated that Mr. Zahos had "drafted this Addendum based on input from [Mr. Vorotyntsev] that I haven't corroborated with [Mr. Khmaladze] so want to make sure this reflects both party's [*sic*] intent."  Draft Addendum.

The Draft Addendum contemplated an amendment to Section 2.3 of the Asset Purchase Agreement "to create a 4-year vesting schedule for the 40% of Aum Code Class A Units due to Dmitriy under the APA."  *Id.*  Under the Draft Addendum, vesting was to begin on the date on

which AUM Code "or its affiliate releases a production version of a software product or software"
that incorporated the intellectual property transferred from IT Adapter Corp. to AUM Code. *Id.*
No party has produced a signed version of the Draft Addendum. Chattoraj Decl. ¶ 10. Mr.
Vorotyntsev testified Mr. Khmaladze agreed to the Draft Addendum and signed it, and that Mr.
Vorotyntsev's lawyers had the executed copy. Vorotyntsev Dep. II 60:13–61:16; 72:14–73:20. But
neither Mr. Vorotyntsev nor his counsel has ever produced the signed agreement. Mr. Vorotyntsev
also testified that Mr. Khmaladze's shares of AUM Code never vested, *Id.* 148:14–16, and
represented in an affidavit in response to another motion in this action that he was the sole owner of
AUM Code. Dkt. No. 129 ("Default Judgment Affidavit").

### F. Mr. Khmaladze's Contact with Mr. Tatintsian

In August 2016, tensions between Mr. Vorotyntsev and a major Shoplink investor, Gary
Tatintsian, boiled over. Vorotyntsev Affidavit at 17. After a phone call during which Mr. Tatintsian
threatened to "dissolve [Mr. Vorotyntsev] in acid," Mr. Tatintsian emailed Mr. Vorotyntsev, copying
Mr. Khmaladze, complaining that Mr. Vorotyntsev had refused to give him a "strait [*sic*] answer"
about Shoplink's technology and the timeline for completion of the Shoplink prototype. *Id.* at 18;
Dkt. No. 276 ("Chattoraj Reply") ¶ 5; Dkt. No. 276-5 (Email dated Aug. 22, 2016). On August 23,
2016, Mr. Vorotyntsev responded to Mr. Tatintsian, also copying Mr. Khmaladze, telling him that
"[Mr. Khmaladze] will stand by for a conversation with you tomorrow and will walk you through the
demo and explain if necessary where we are with respect to our timetable." Chattoraj Reply ¶ 6;
Dkt. No. 276-6 (Email dated Aug. 23, 2016). The email also stated that "[o]therwise, [Mr.
Khmaladze] and the tech team are off limits and NOT to be contacted without my prior express
permission." *Id.* Later that day, Mr. Vorotyntsev forwarded Mr. Tatintsian login information for
the Shoplink demos, as well as the "vendor set up manual." *Id.*

The following month, Mr. Tatintsian and Mr. Khmaladze spoke over the phone once,

pursuant to Mr. Vorotyntsev's instructions.  Khmaladze Dep. 203:11–13; 206:25–207:3.  They then met at a hotel in Ohio, during which they discussed the Shoplink pilot.  Khmaladze Dep. 207:6–8; 208:16–17.  Mr. Tatintsian asked Mr. Khmaladze why Shoplink was not yet operational, and Mr. Khmaladze revealed that "there [we]re no vendors," "no one to pilot with," "no contracts signed," and "nothing there . . . .  [T]here is no one to fulfill orders, to fulfill any orders, zero, nothing." Khmaladze Dep. 221:20–222:15.

Also in September, Mr. Tatintsian emailed Mr. Khmaladze a Shoplink bank statement showing that Mr. Vorotyntsev had used Shoplink funds for personal expenses.  Chattoraj Reply ¶¶ 12–13; Dkt. Nos. 265-12 (Email dated Sept. 6, 2016), 265-13 (Email dated Sept. 6, 2016); Khmaladze Dep. 282:7–286:10.  On September 12, 2016, Mr. Khmaladze emailed Mr. Vorotyntsev and the other developers working for IT Adapter LLC announcing that he had just learned that Mr. Tatintsian was suing Mr. Vorotyntsev in connection with his activities with Shoplink.  Chattoraj Reply ¶ 11; Dkt. No. 265-11 (Email dated Sept. 12, 2016).  In the email, Mr. Khmaladze announced his resignation.  *Id.*

Mr. Khmaladze subsequently blocked Mr. Vorotyntsev from the IT Adapter LLC email account and "Assembla," the online repository that stored code for the Shoplink platform. Khmaladze Dep. 217:8–13; 309:12–16;  Vorotyntsev Dep. II 91:15–21; 92:6–16.  Assembla contained both the code originally owned by IT Adapter Corp. that was to be assigned to AUM Code pursuant to the Asset Purchase Agreement, in addition to the proprietary, non-public code developed by Mr. Khmaladze and the other developers in the course of their work for Defendants (together, the "Shoplink Software").  Khmaladze Dep. 104:18–25; 128:7–17.  Losing access to the IT Adapter LLC email also prevented Mr. Vorotyntsev from communicating with the developers. Vorotyntsev Dep. II 124:16–24.  Mr. Khmaladze later gave Mr. Vorotyntsev a copy of the code and the emails, but some of the emails and some parts of the code were missing.  Vorotyntsev Affidavit

at 8, 18.

### G.  Mr. Khmaladze's New Company

Mr. Khmaladze and Mr. Tatintsian formed a new company called Agnicore in October 2016. Khmaladze Dep. 77:10–12.  Agnicore hired some of the developers that had worked for Shoplink. *Id.* 83:14–24.  One of the applications that Agnicore worked to develop was called "Monetize Your Influence."  *Id.* 87:2–8; 231:22–232:2.  Mr. Vorotyntsev asserts that Shoplink had an "identical" product with the same name.  Vorotyntsev Affidavit 19.  However, Mr. Khmaladze has presented uncontroverted testimony that Agnicore used a "different code base, different build, different framework, different . . . structure" than any of Shoplink's technology, and did not utilize any of the code transferred pursuant to the Asset Purchase Agreement or developed by Mr. Khmaladze and his team for Defendants.  Khmaladze Dep. 307:16–308:25.

One of Agnicore's clients was a book distributor named Readerlink, which became Agnicore's client after an introduction by Younis Zubchevich.  *Id.* at 316:10–317:6.  Mr. Zubchevich had previously connected Mr. Vorotyntsev with Readerlink.  *Id.* 123:3–4.  In October or November of 2017, Agnicore began alpha-testing Monetize Your Influence with Readerlink.  *Id.* 236:3–7.  In 2018, Agnicore folded.  *Id.* 72:5–15.  It had never publicly launched a product or generated revenue. *Id.* 261:7–14; 253:3–254:9.

### H.  Procedural History

On September 15, 2016, Mr. Tatintsian sued Mr. Vorotyntsev and his companies for securities fraud.  1:16-cv-7203, at Dkt. No. 1.  On October 13, 2016, Mr. Khmaladze and ITAdapter Corp. filed this related action seeking rescission of the Asset Purchase Agreement and declaratory judgment that Defendants materially breached it.  Dkt. No. 1.  Defendants later filed a slew of counterclaims.  Dkt. Nos. 36, 37.  The counterclaims were mainly based on the theory that Mr. Khmaladze had broken his commitment to develop a product for Defendants then conspired with

Mr. Tatintsian to steal Defendants' business idea and source code for Agnicore and turn Defendants' investors against them.

Plaintiffs then moved to dismiss some of the counterclaims. Dkt. Nos. 47. The Court dismissed Mr. Vorotyntsev's individual counterclaim for breach of fiduciary duty because Defendants did not adequately plead that Mr. Khmaladze owed Mr. Vorotyntsev a fiduciary duty, but declined to dismiss the other challenged claims. Dkt. No. 69. Specifically, the Court rejected Plaintiffs' argument that Defendants' unjust enrichment and promissory estoppel counterclaims were duplicative of its breach of contract counterclaim, held that Shoplink had adequately pleaded tortious interference with prospective business relations by alleging that Mr. Khmaladze and his co-conspirators harassed investors, and held that Defendants had adequately pleaded breach of the Asset Purchase Agreement by alleging that Mr. Khmaladze violated the non-solicit and non-compete provisions. *Id.* Plaintiffs later moved for summary judgment on all of Defendants' remaining counterclaims, as well as on most of their own claims. Dkt. Nos. 262, 264 ("Pl. Mem."). Defendants filed an opposition. Dkt. No. 270 ("Def. Opp."). The matter was fully briefed when Plaintiffs filed a reply. Dkt. No. 274.[1] The Court will briefly outline Plaintiffs' arguments for summary judgment.

### a. **Plaintiffs' Claims**

Plaintiffs first argue they are entitled to declaratory judgment that Defendants materially breached the Asset Purchase Agreement, because Defendants failed to provide Plaintiffs with the promised 40% membership interest in AUM Code. They also argue that they are entitled to

---

[1] Mr. Vorotyntsev also filed a Rule 56.1 Statement and a brief in opposition to the motion for summary judgment. Dkt. Nos. 279, 280. The Court disregards those materials because this motion does not concern any claims against Mr. Vorotyntsev individually or any counterclaims by Mr. Vorotyntsev individually. Mr. Vorotyntsev does not represent the corporate defendants and the law does not permit him to do so. *See Rowland v. California Men's Colony*, 506 U.S. 194, 201–02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."); *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997) ("[I]t is well established that a layperson may not represent a corporation.").

rescission of the Asset Purchase Agreement on the same ground.  Finally, Plaintiffs argue that the rescission of the agreement renders the agreement's non-compete and non-solicitation provisions unenforceable.

### b. Defendants' Breach of Contract Counterclaims

Next, Plaintiffs move for summary judgment on Defendants' three breach of contract counterclaims.  Defendants' claims are based on Mr. Khmaladze's alleged breach of the Asset Purchase Agreement, the NDA, and an alleged contract between Shoplink and Mr. Khmaladze that obligated Mr. Khmaladze to develop software.  With respect to the counterclaim for breach of the Asset Purchase Agreement, Plaintiffs assert that there is no evidence that the term that Mr. Khmaladze allegedly breached—an obligation to develop software—was a condition of the agreement.  With respect to the counterclaim for breach of the NDA, they argue that Mr. Khmaladze disclosed confidential information only at the express direction of Mr. Vorotyntsev. Finally, with respect to the counterclaim for breach of an alleged contract to develop software, Plaintiffs assert that there is no evidence that the alleged contract existed.

### c. Defendants' Declaratory Judgment Counterclaims

Plaintiffs also move for summary judgment on Defendants' counterclaims for declaratory judgment.  First, Defendants sought declaratory judgment "as to its rights to the ShopLink software, including the code created by Khmaladze after execution of the APA."  AUM Code Counterclaims ¶ 161.  Plaintiffs assert that they are entitled to summary judgment on this counterclaim because Defendants do not own any of the software.  With respect to the software that was the subject of the Asset Purchase Agreement, Plaintiffs argue that Defendants have no rights to that software because the Asset Purchase Agreement must be rescinded.  With respect to the software developed by Mr. Khmaladze during his employment relationship with Defendants following the execution of the Asset Purchase Agreement, Plaintiffs argue that Mr. Khmaladze is the sole owner of that

software because he was an independent contractor without a work for hire contract.

Second, Defendants sought declaratory judgment that under the non-compete and non-solicitation provisions of the NDA, "Khmaladze and ITAdapter Corp. Inc. cannot work on the ShopLink software independent or in correlation with third parties without ShopLink's consent." Shoplink Counterclaims ¶ 181.  Plaintiffs argue that they are entitled to summary judgment on this counterclaim because the non-compete and non-solicitation provisions of the NDA are not enforceable because they are impermissibly vague and broad.

### d.  Defendants' Conversion Counterclaim

Next, Plaintiffs move for summary judgment on Defendants' counterclaim for conversion of the Shoplink Software.  Plaintiffs argue that because Defendants did not own the software, their counterclaim for conversion must fail.  As an alternative ground for summary judgment, though Plaintiffs concede that Mr. Khmaladze temporarily blocked Mr. Vorotyntsev's access to the software, they assert that the counterclaim fails because Mr. Khmaladze delivered a complete, functional copy of the software to Mr. Vorotyntsev shortly thereafter.

### e.  Shoplink's Unfair Competition Counterclaim

Plaintiffs also argue that they are entitled to summary judgment on Shoplink's unfair competition counterclaim.  Defendants raise a number of theories of unfair competition, including Plaintiffs' alleged misappropriation of the Shoplink Software and various Shoplink trade secrets. Plaintiffs argue that they are entitled to summary judgment because there is no evidence that Plaintiffs misappropriated any commercial advantage from Shoplink.  Specifically, they argue that there is no evidence that Mr. Khmaladze used the Shoplink Software to develop Agnicore, and that Defendants have not identified any other confidential information or trade secrets belonging to Shoplink.  They also argue that damages are required for a claim for unfair competition, and that there is no evidence of damages.

### f.  Shoplink's Unjust Enrichment Counterclaim

Next, Plaintiffs argue that they are entitled to summary judgment on Shoplink's unjust enrichment counterclaim because there is no evidence that Shoplink, as opposed to IT Adapter LLC, paid Mr. Khmaladze. They also argue that New York law prohibits Shoplink from recovering any compensation it paid to Mr. Khmaladze during the time that Mr. Khmaladze remained loyal to the defendants.

### g.  Shoplink's Tortious Interference Counterclaim

Plaintiffs also assert that they are entitled to summary judgment on Shoplink's tortious interference counterclaim because there is no evidence that Mr. Khmaladze had any contact with any Shoplink investors other than Mr. Tatintsian. They also assert that there is no evidence of any injury to Defendants from Mr. Khmaladze's alleged interference.

### h.  Shoplink's Promissory Estoppel Counterclaim

Next, Plaintiffs assert that they are entitled to summary judgment on Shoplink's promissory estoppel counterclaim because there is no evidence that Mr. Khmaladze made any clear or definite promises to Defendants. In the alternative, they argue that Plaintiff did perform all of the promised work.

### i.  Defendants' Breach of Fiduciary Duty Counterclaim

Finally, Plaintiffs assert that they are entitled to summary judgment on Defendants' breach of fiduciary duty counterclaims. They argue that under Delaware law, Mr. Khmaladze could not have owed any fiduciary duty to AUM Code or IT Adapter LLC because he was not a managing member of either company. They then assert that there is no evidence that Mr. Khmaladze owed a fiduciary duty to Shoplink and no evidence that he breached any such duty. They also argue that proof of damages is required for a claim for breach of fiduciary duty, and that there is no evidence of damages.

III.    **LEGAL STANDARD**

    A. **Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

### B. Local Rule 56.1

Local Rule 56.1 requires that a party moving for summary judgment submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local R. 56.1(a). The party opposing summary judgment must submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." Local R. 56.1(b). The statements in the numbered paragraphs "will be deemed to be admitted for purposes of the motion unless specifically controverted." Local R. 56.1(c). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P.

56(c)."  Local R. 56.1(d).  A Local Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  Moreover, in evaluating a motion for summary judgment, the Court "is not required to consider what the parties fail to point out in their Local Rule 56.1 statements . . . ."  *Id.* at 73 (quoting *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)).

Defendants' Rule 56.1 Statement fails to comply with Local Rule 56.1 in several respects. First, it is replete with factual assertions "that are otherwise unsupported in the record."  *Holtz*, 258 F.3d at 74.  The Court need not, and has not, scoured the record for evidence that might support those assertions.  *Id.* at 73; *see also Nicholas Acoustics & SpecialT.Y. Co. v. H & M Const. Co.*, 695 F.2d 839, 846-47 (5th Cir. 1983) ("[J]udges are not ferrets" and "practical constraints on the time of a judge make it impossible for the judge to examine a record of even moderate size with such finitude as to be both exhaustive and exhausting.").[2]

Second, rather than limiting their Rule 56.1 Statement to a "short and concise statement of the material facts," Local R. 56.1(b), Defendants have crammed their Rule 56.1 Statement with legal argument that does not appear in their brief.  "Courts can and do ignore all portions of [a] Rule 56.1 Statement that contain [such] improper legal argument . . . ."  *Bellis v. New York City Dep't of Educ.*, No. 21-CV-3282 (JMF), 2024 WL 1177232, at *2 (S.D.N.Y. Mar. 19, 2024) (alteration in the original) (quoting *Emanuel v. Griffin*, No. 13-CV-1806 JMF, 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015) (internal quotations omitted); *India Globalization Cap., Inc. v. Apogee Fin. Invs., Inc.*, No. 21-CV-1131 (VEC), 2023 WL 5003347, at *2 (S.D.N.Y. Aug. 4, 2023) (disregarding legal argument in a Rule 56.1 Statement); *Kesner v. Buhl*, 590 F. Supp. 3d 680, 691 (S.D.N.Y. 2022), *aff'd sub nom. Kesner v. Dow Jones*

---

[2] Because the Court has considered only the evidence that the parties cite in their Rule 56.1 Statements, references in this opinion to evidence that a party "pointed to" or "presented" refer only to evidence cited in Rule 56.1 Statements, and not more generally to all of the evidence that a party has entered into the record but "fail[ed] to point out in [its] Local Rule 56.1 statement . . . ."  *Holtz*, 258 F.3d at 73 (quoting *Monahan*, 214 F.3d at 292).

*& Co., Inc.*, No. 22-875, 2023 WL 4072929 (2d Cir. June 20, 2023) (setting aside the portions of a Rule 56.1 Statement that contained legal argument). However, the Court has considered the arguments that appear in Defendants' Rule 56.1 Statement, even though that is not an appropriate place for them.

Third, Defendants respond to many of the statements of fact in Plaintiffs' Rule 56.1 Statement with denials that lack citations to evidentiary support or assertions that a document Plaintiffs cite "speaks for itself." Dkt. No. 269 ("Def's Counterstatement") ¶ 17. The Court deems those facts undisputed, because Rule 56.1 requires that "each statement controverting any statement of material fact [] must be followed by citation to evidence . . . ." LR 56.1(d); *see, e.g., Tapia v. TWC Admin. LLC*, No. 17-CV-431 (KMK), 2018 WL 5016608, at *1 (S.D.N.Y. Oct. 16, 2018) ("[S]ome of Plaintiff's purported denials in the 56.1 statement are merely semantic disagreements with Defendant's language or recitations of other, often irrelevant facts. . . . These paragraphs do not actually challenge the factual substance described in the relevant paragraphs in Defendant's 56.1 statement, and thus the Court will not consider them as creating disputes of fact.").

Finally, the Court observes that Defendants frequently attempt to support the factual assertions in their statement with citations to a 15-page affidavit by Mr. Vorotyntsev, with no pin cites. The Court has considered the entirety of the affidavit in its analysis. Plaintiffs argue that the Court should disregard the affidavit because it is a "conclusory" and "self-serving narrative by Vorotyntsev that contradicts his deposition testimony or other undisputed evidence on material points." Reply at 1. Because Defendants do not support this argument by pointing to specific portions of deposition testimony or other "undisputed evidence" that contradicts the affidavit, the Court does not disregard the affidavit in whole on this ground. *See Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014) (explaining that the sham affidavit doctrine prevents a party from submitting an affidavit that contradicts his own deposition testimony).

17

## IV.  DISCUSSION

As outlined above, Plaintiffs have moved for summary judgment on their claims for declaratory judgment that Defendants materially breached the Asset Purchase Agreement, declaratory judgment that the Asset Purchase Agreement is non-enforceable, and rescission of the Asset Purchase Agreement.  They also move for summary judgment on Defendants' counterclaims for breach of contract, breach of the Asset Purchase Agreement, breach of the NDA, promissory estoppel, unjust enrichment, breach of fiduciary duty, unfair competition, and declaratory judgments related to both the NDA and the ownership of the software copyright.  The Court addresses each claim and counterclaim in turn.

### A.  Declaratory Judgment that Defendants' Materially Breached the Asset Purchase Agreement

Plaintiffs are entitled to summary judgment on the claim that Defendants materially breached the Asset Purchase Agreement, because Defendants failed to give Plaintiffs a 40% membership Interest in AUM Code.  The Court first analyzes the question of whether the contract was breached, and then considers the materiality of the breach.  A claim for breach of contract requires proof that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations."  *LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

Here, Mr. Vorotyntsev breached the Asset Purchase Agreement by failing to give Plaintiffs a 40% membership interest in AUM Code, as required by Section 2.3 of the agreement.  Mr. Vorotyntsev testified that Plaintiffs' membership interest in AUM Code never "vested," and submitted an affidavit in this action asserting that he remained the sole member of AUM Code. Vorotyntsev Dep. II 148:14–16; Dkt. No. 129.

Defendants' attempts to contradict that proposition are not supported by competent evidence.  In support of their position that Mr. Khmaladze received the promised 40% membership interest, they cite Mr. Vorotyntsev's affidavit.  Mr. Vorotyntsev states in his affidavit that in 2015,

after the execution of the Asset Purchase Agreement, "[Mr. Vorotyntsev] and [Mr. Khmaladze] both agreed that [Mr. Khmaladze] already owned the 40%, regardless of any document." Vorotyntsev Affidavit at 9. But the Court must disregard this portion of Mr. Vorotyntsev's affidavit because it is contradicted by his deposition testimony. Under the sham affidavit doctrine, a party cannot "defeat[] summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *Moll*, 760 F.3d 198 at 205 (citing *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013)). Here, Mr. Vorotyntsev testified that Plaintiffs' membership interest in AUM Code never "vested." Vorotyntsev Dep. II 148:14–16. Accordingly, he cannot create a dispute of fact regarding Mr. Khmaladze's ownership of AUM Code with his affidavit.

Moreover, the oral agreement described in Mr. Vorotyntsev's affidavit would have had no legal effect, because the Asset Purchase Agreement required that any subsequent agreement be in writing and signed by Mr. Khmaladze. APA § 10.6. Defendants point to no evidence of a signed written agreement memorializing the alleged oral agreement. Accordingly, Defendants have not raised a genuine dispute of fact as to whether Plaintiffs received the 40% membership interest in AUM Code.

Defendants also argue that "the evidence shows that Khmaladze was paid over $300,000 . . . and received paid vacations." Def. Opp. at 1. But Mr. Khmaladze did not receive the money and vacations pursuant to the Asset Purchase Agreement, which contemplated only an exchange of ITAdapter Corp.'s assets for the AUM Code membership interest. *See* APA § 2.3 (defining the "Purchase Price" for ITAdapter Corp.'s assets as "a number of Class A Units equal to 40% of the outstanding membership units of [AUM Code] . . . ."). Instead, Mr. Khmaladze received the money and vacations in exchange for his software development services. Compensation Mr. Khmaladze received pursuant to other agreements or arrangements is not relevant to the parties' obligations under the Asset Purchase Agreement. Therefore, there is no genuine dispute of fact that

Defendants breached their obligations under the Asset Purchase Agreement.

Finally, Defendants argue that Plaintiffs have failed to establish the second element of the claim, that Plaintiffs performed in accordance with the contract, because Mr. Khmaladze "abandoned the defendant-employer before he completed his work." Def. Opp at 1–2. But Defendants have not presented evidence that shows that Mr. Khmaladze had any such obligation under the Asset Purchase Agreement. As an initial matter, no obligation for Mr. Khmaladze to "complete[] his work" appears in the text of the agreement. Instead, the agreement required him to transfer assets to AUM Code, and Defendants do not dispute that he did so.

However, the Court understands Defendants' argument to rely instead on the text of the Draft Addendum, which contemplated that Mr. Khmaladze would receive the 40% membership interest only after AUM Code "or its affiliate releases a production version of a software product or software." *See* Draft Addendum. To the extent that such a provision can be read to require Mr. Khmaladze to "complete[] his work," Defendants' argument is still unavailing, because they have not pointed to competent evidence that an agreement containing the terms of the Draft Addendum was ever executed. Under Federal Rule of Evidence 1001, "[a]n original writing, recording, or photograph is required in order to prove its content," Fed. R. Evid. 1001, and Defendants have not produced one.[3] Instead, they point only to Mr. Vorotyntsev's testimony that he recalled seeing an executed copy of the addendum, Vorotyntsev Dep. II 60:16–61:8, which is not competent evidence

---

[3] Defendants also assert in their Rule 56.1 Statement that the reason they failed to produce the signed addendum was that Mr. Khmaladze deleted it from the IT Adapter LLC email account. The Court acknowledges, though Defendants do not make this argument explicitly, that under Federal Rule of Evidence 1004, a party may use other evidence to prove the contents of a writing where the original has been lost or destroyed. Fed. R. Evid. 1004. However, here, there is no evidence that the exception applies. In support of their argument that the addendum was deleted, Defendants cite only to Mr. Vorotyntsev's affidavit, which states neither that a signed addendum existed, nor that the original was stored on the IT Adapter LLC email account. Moreover, Mr. Vorotyntsev testified that his lawyers, and not IT Adapter LLC, possessed the original copy of the signed addendum. Vorotyntsev Dep. II 72:14–73:20. Again, Defendants are precluded from contradicting that testimony with an affidavit. *See Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) ("[A] party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting his affidavit denying the fact.").

for this purpose.  Therefore, Defendants have not created a genuine dispute of fact as to the question of breach.

Defendants' breach of the Asset Purchase Agreement was also material.  A material breach has been "defined as one which . . . is so substantial as to defeat the purpose of the entire transaction." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 895 (2d Cir. 1976).  "Whether a failure to perform constitutes a 'material breach' turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016).  Under New York law, "the question of the materiality of a breach 'is usually a question of fact and should be decided as a matter of law only where the inferences are certain.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) (quoting *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 380 (S.D.N.Y. 2014)).

In this case, the inferences are certain:  Defendants' failure to transfer the 40% membership interest was a material breach.  The Asset Purchase Agreement defined the 40% membership interest as the "consideration payable to Seller for the Assets."  APA § 1.1.  The agreement did not require any other performance by Defendants, other than the preparation of an operation agreement for AUM Code.  Therefore, the failure to transfer the membership interest "defeat[ed] the purpose of the entire transaction." *Lipsky*, 551 F.2d at 895; *cf. Riviera Fin. of Tex., Inc. v. Capgemini US, LLC*, 511 F. App'x 92, 95 (2d Cir. 2013) (summary order) (holding that a failure to pay for services constituted a material breach of a contract for services and granting summary judgment).  Accordingly, Plaintiffs are entitled to summary judgment on this claim.

### B.  Rescission of the Asset Purchase Agreement

Plaintiffs are entitled to rescission of the Asset Purchase Agreement because Defendants failed to provide any of the consideration contemplated by the Asset Purchase Agreement.  Under

New York law, one ground for rescission of a contract is failure of consideration.[4]  "Failure of consideration is a generic expression covering every case where an exchange of values is to be made and the exchange does not take place, either because of the fault of a party or without his fault." *Hadden v. Consol. Edison Co.*, 34 N.Y.2d 88, 95 n.6 (1974) (citing Restatement, Contracts, § 274, Comment a).  In the event of "a failure of consideration . . . there should be a rescission."  *Schwartz v. Nat'l Comput. Corp.*, 345 N.Y.S.2d 579, 582 (2d Dep't 1973); *see also Courchevel 1850 LLC v. Wisdom Equities LLC*, 846 F. App'x 33, 35 (2d Cir. 2021) (summary order) (holding that "[a] contract may be rescinded for failure of consideration") (alteration in the original).

"A right to rescind, abrogate, or cancel a contract must be exercised promptly on discovery of the facts from which it arises."  *Schwartz*, 345 N.Y.S.2d at 582.  "Notice of the rescission of a contract for . . . failure of consideration may be made at any time within the statute of limitations unless delay would be inequitable."  *Id.* (citing 10 N.Y. Jur., Contracts, § 411); *see also Converse v. Schmidlapp*, 35 N.Y.S.2d 486, 487–88  (1st Dep't 1942) (holding that rescission was warranted because "there has been a complete failure of consideration" and the plaintiff had made "a timely protest as to the failure to organize the corporation as agreed. . . .  [N]otice to rescind could be given at any time within the period of the Statute of Limitations unless there should be some inequitable result from the delay").

Plaintiffs are entitled to rescission because Defendants' failure to provide them with a 40% membership interest in AUM Code was a failure of consideration.  Defendants do not contend that Plaintiffs failed to provide timely notice of the intent to rescind, or that rescission will lead to inequitable result.  Therefore, the Court deems those arguments abandoned.  Nonetheless, the Court observes that Plaintiffs provided timely notice of their intent to rescind by filing this lawsuit seeking

---

[4] Another ground is material breach.  Because Plaintiffs are entitled to rescission based on failure of consideration, the Court does not consider whether they are also entitled to rescission on this ground.

rescission in 2016, well within the statute of limitations for a rescission action.  *See* Dkt. No. 1; *Hosseiniyar v. Alimehri*, 852 N.Y.S.2d 338, 340 (2d Dep't 2008) ("Actions for rescission are governed by the six-year statute of limitations contained in CPLR 213 (1).").  In addition, the Court sees no inequity that would result from rescission of the agreement.  The adverse consequences of the decision are those that flow naturally from Defendants' breach—they do not get to keep the benefits of a bargain for which they did not pay.  Accordingly, Plaintiffs are entitled to summary judgment on this claim.

### C.  Declaratory Judgment for Non-Enforceability of the Asset Purchase Agreement's Confidentiality and Non-Compete Provisions

Plaintiffs are also entitled to summary judgment on their claim for declaratory judgment that the confidentiality and non-compete provisions of the Asset Purchase Agreement are non-enforceable, because Defendants have abandoned defenses to this claim.  In their motion, Plaintiffs argue that the rescission of the Asset Purchase Agreement renders those provisions of it unenforceable.  Because Defendants do not respond to this argument in their papers, the Court considers any defense to it abandoned.  *See Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) ("Generally, but perhaps not always, a partial response reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. . . .  Where abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended.").  Accordingly, Plaintiffs are entitled to summary judgment on this claim.

### D.  AUM Code's Counterclaim for Breach of the Asset Purchase Agreement

The rescission of the Asset Purchase Agreement also entitles Plaintiff to summary judgment on AUM Code's counterclaim that Plaintiffs breached the Asset Purchase Agreement.  "Under clearly established New York law, '[o]nce an agreement has been rescinded, there can be no claims based on the cancelled agreement unless the right to make such claims is expressly or impliedly

reserved within the terms of the rescission.'" *Napster, LLC v. Rounder Records Corp.*, 761 F. Supp. 2d

200, 206 (S.D.N.Y. 2011) (quoting *Milan Music, Inc. v. Emmel Commc'ns Booking, Inc.*, 829 N.Y.S.2d 485

(3d Dep't 2007)) (collecting cases).  Moreover, Defendants' theory of Plaintiffs' breach of the Asset

Purchase Agreement is premised on Mr. Khmaladze's alleged failure to perform software

development services.  As discussed in Section IV(A), the Asset Purchase Agreement did not require

Mr. Khmaladze to develop software, and therefore, any failure to do so does not constitute a breach

of the agreement.  Accordingly, Plaintiffs are entitled to summary judgment on this counterclaim.

### E.  Copyright Declaratory Judgment Counterclaim

Plaintiffs are entitled to summary judgment on Defendants' counterclaim for declaratory

judgment "as to its rights to the ShopLink [S]oftware" because Defendants do not own any of the

software.  As described, the Shoplink Software consists of (1) the code transferred pursuant to the

Asset Purchase Agreement; and (2) the code developed by Mr. Khmaladze and Defendants' other

software developers after the execution of the Asset Purchase Agreement.  With respect to the

former, Defendants' ownership is premised on the Asset Purchase Agreement.  Therefore, the

rescission of the Asset Purchase Agreement defeats the counterclaim with respect to that code.  As

a result, the Court need only analyze the counterclaim with respect to the latter—the code

developed by Mr. Khmaladze and Defendants' other software developers after the execution of the

Asset Purchase Agreement.

The Copyright Act of 1976 provides that copyright ownership "vests initially in the author

or authors of the work."  17 U.S.C. § 201(a).  "As a general rule, the author is the party who actually

creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled

to copyright protection."  *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).  "The Act

carves out an important exception, however, for 'works made for hire.'  If the work is for hire, 'the

employer or other person for whom the work was prepared is considered the author' and owns the

copyright, unless there is a written agreement to the contrary." *Id.* Two types of works are considered to be works for hire:

> (1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire.

17 U.S.C. § 101. For this purpose, "the term 'employee' should be understood in light of the general common law of agency." *Reid*, 490 U.S. at 741. In determining whether a hired party is an employee under the common law of agency, a court must consider:

> the hiring party's right to control the manner and means by which the product is accomplished; among the other factors relative to this inquiry are (1) the skill required, (2) the source of the instrumentalities and tools, (3) the location of the work, (4) the duration of the relationship between the parties, (5) whether the hiring party has the right to assign additional projects to the hired party, (6) the extent of the hired party's discretion over when and how long to work, (7) the method of payment, (8) the hired party's role in hiring and paying assistants, (9) whether the work is part of the regular business of the hiring party, (10) whether the hiring party is in business, (11) the provision of employee benefits, and (12) the tax treatment of the hired party.

*Id.* at 751–52. "[N]o one of these factors is determinative." *Id.* at 752; *see also Horror Inc. v. Miller*, 15 F.4th 232, 242 (2d Cir. 2021) (holding that "because the definition of 'employee' under copyright law is grounded in the common law of agency" courts must use the *Reid* framework to analyze copyright questions).

Defendants have not presented evidence that would allow a reasonable factfinder to conclude that Mr. Khmaladze was either Defendants' employee or bound by a work for hire contract in connection with the development of the code. With respect to an employment relationship, Plaintiffs have presented evidence establishing that Mr. Khmaladze was an independent contractor under *Reid*. As to the "location of the work," *Reid*, 490 U.S. at 751, Mr. Khmaladze worked from his home in Ohio, across the country from Mr. Vorotyntsev. Khmaladze Dep.

209:22–210:21. With respect to the payment and employee benefits factors, Mr. Khmaladze did not

receive employee benefits and was not treated as an employee for tax purposes. Vorotyntsev Dep.

II 64:5–13; Chattoraj Decl. ¶ 16; Dep. II 88:2–9; Chattoraj Decl. ¶ 17; Vorotyntsev Dep. I at 186:4–

25; Chattoraj Decl. ¶ 18. As a software developer, Mr. Khmaladze was also a skilled worker—he

had his own software development company and the Shoplink software was based on his propriety

code. *See, e.g.*, *Yu v. New York City Hous. Dev. Corp. (HDC)*, No. 07 CIV. 5541 GBD MHD, 2011 WL

2326892, at *29 (S.D.N.Y. Mar. 16, 2011) (noting that "computer programmers have been found to

be independent contractors in several other cases" because the profession requires skill) *report and

recommendation adopted sub nom. Yu v. New York City Hous. Dev. Corp.*, No. 07 CIV. 5541 GBD, 2011

WL 2183181 (S.D.N.Y. June 3, 2011), *aff'd*, 494 F. App'x 122 (2d Cir. 2012) (summary order). He

also had discretion over payment of all the developers who assisted him. Vorotyntsev Dep. II 86:5-

15, 93:18-94:9.

Defendants do not present evidence that contradicts these facts, nor do they present

evidence of other facts that suggest Mr. Khmaladze was an employee under *Reid*. Instead, they

conclusorily assert that Mr. Khmaladze was an employee and cite Mr. Vorotyntsev's affidavit in

support. The affidavit, however, only provides further evidence that Mr. Khmaladze was an

independent contractor. According to the affidavit, Mr. Khmaladze chose whether to hire a team

and whom to hire, insisted on using a particular programming language and his own proprietary

software, and informed Mr. Vorotyntsev of the time it would take to complete a pilot. Vorotyntsev

Affidavit at 6, 7. All of those circumstances show that Mr. Khmaladze exercised significant control

over the "manner and means" of the work. *Reid*, 490 U.S. at 751. Accordingly, based on the

evidence presented by the parties, no reasonable factfinder could conclude that Mr. Khmaladze was

an employee.

Second, Defendants have presented no evidence that a work for hire contract existed

between Mr. Khmaladze and any of the defendants.  No party produced such a contract in

discovery.  Chattoraj Decl. at 2–3.  In their Rule 56.1 statement, Defendants assert that Mr.

Khmaladze signed a work for hire contract.  Def's Counterstatement ¶ 101.  But they offer no

evidence that supports that assertion.  Instead, they cite only Mr. Vorotyntsev's affidavit, which does

not reference such an agreement.  A Rule 56.1 statement "is not itself a vehicle for making factual

assertions that are otherwise unsupported in the record." *Holtz*, 258 F.3d at 74.  Accordingly,

Plaintiffs are entitled to summary judgment on this counterclaim.

### F.  Shoplink's Breach of Contract Counterclaim

Plaintiffs are entitled to summary judgment on Shoplink's breach of contract counterclaim,

because Defendants have not presented evidence that supports the existence of a software

development contract between Mr. Khmaladze and Shoplink.  "To prevail on a breach-of-contract

claim in New York, a [party] must prove:  '(1) the existence of a contract, (2) performance by the

party seeking recovery, (3) nonperformance by the other party, and (4) damages attributable to the

breach.'" *Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) (quoting *RCN Telecom Servs., Inc. v.

202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 350-51 (2d Cir. 2005) (summary order)).

As to the first element, "[t]o create a binding contract under New York law, the parties must

provide a 'manifestation of mutual assent sufficiently definite to assure that [they] are truly in

agreement with respect to all material terms.'" *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177,

199 (2d Cir. 2019) (quoting *Stonehill Capital Mgmt., LLC v. Bank of the West*, 28 N.Y.3d 439, 448

(2016)).  "In determining whether mutual assent has been shown, courts 'look to the objective

manifestations of the intent of the parties as gathered by their expressed words and deeds.'" *Id.*

(quoting *Stonehill Capital Mgmt., LLC*, 28 N.Y.3d at 448).  Where a party claims the existence of an

oral agreement, it "faces a heavier burden":  "[t]o ensure that parties are not trapped into surprise

contractual obligations that they never intended, more than agreement on each detail is required,

there must be an overall agreement to enter into the binding contract." *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 514 (S.D.N.Y. 2012), *aff'd*, 766 F.3d 163 (2d Cir. 2014) (quoting *Bloch v. Gerdis*, No. 10 Civ. 5144(PKC)(AJP), 2011 WL 6003928, at *3 (S.D.N.Y. Nov. 30, 2011)) (other quotations omitted).

Plaintiffs are entitled to summary judgment because Defendants have not pointed to evidence that supports the first or third elements of the claim. First, Defendants have not presented evidence that establishes the existence of a contract between Mr. Khmaladze and Shoplink to develop software. Defendants assert that Mr. Khmaladze had an "oral and written contract" with Shoplink that required him "to prepare a technology platform and source code, in exchange for compensation." Def's Counterstatement ¶¶ 120–121. In support of this assertion, Defendants cite only Mr. Vorotyntsev's affidavit. In his affidavit, Mr. Vorotyntsev explains that Mr. Khmaladze was the CTO of IT Adapter LLC, that he worked with other developers employed by IT Adapter LLC to create software, and that Mr. Khmaladze received compensation, which the parties agreed was withdrawn from the IT Adapter LLC bank account. Vorotyntsev Dep. I 185:16–18. The only relationship that Mr. Vorotyntsev mentions between Shoplink and Mr. Khmaladze is that "Mikhail wanted Dmitry to be comfortable so he could produce, so Shoplink paid for everything in DK's life, on top of his salary." Vorotyntsev Affidavit at 8. Those facts are neither adequate evidence of a "manifestation of mutual assent" between Mr. Khmaladze and Shoplink that is "sufficiently definite to assure that [they] are truly in agreement with respect to all material terms," *NRP Holdings LLC*, 916 F.3d 177 at 199 (quoting *Stonehill Capital Mgmt., LLC*, 28 N.Y.3d at 448), nor of "an overall agreement to enter into the binding contract." *Delaney*, 908 F. Supp. at 514 (quoting *Bloch*, 2011 WL 6003928, at *3).

Second, Defendants have not satisfied the third element of the counterclaim, non-performance by Mr. Khmaladze, because they do not identify any terms of the alleged contract that

Mr. Khmaladze breached.  In their Rule 56.1 Statement, Defendants assert that "Shoplink's technology did not have social network coding, did not have code for Shoplink's idea, the demo software could not handle the ultimate application of selling a product, and the source code had no charge processing or accounting functions.  Plaintiff also did not code R-7 for design of master data structures."  Def's Counterstatement ¶ 124.  But they have not presented any evidence, nor do they even appear to argue, that those requirements were terms of the alleged contract.  Accordingly, Plaintiffs are entitled to summary judgment on Shoplink's breach of contract counterclaim.

### G.  Promissory Estoppel Counterclaims

Plaintiffs are not entitled to summary judgment on Defendants' promissory estoppel counterclaim, because there is evidence that Mr. Khmaladze injured Defendants by breaking a promise to complete a Shoplink pilot.  "In order to prevail on a theory of promissory estoppel, a party must establish '(1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance.'"  *Condor Funding, LLC v. 176 Broadway Owners Corp.*, 46 N.Y.S.3d 99, 101 (1st Dep't 2017) (quoting *MatlinPatterson ATA Holdings LLC v. Fed. Express Corp.*, 929 N.Y.S.2d 571, 577 (1st Dep't 2011)).

Defendants have presented evidence to support each element of the counterclaim.  As to the first element, a sufficiently clear and unambiguous promise, Defendants have presented evidence that Mr. Khmaladze "t[old] Mr. Vortyntsev that they w[ould] have a pilot by May 2016." Vorotyntsev Affidavit at 10.  As to the second element, there is evidence that Defendants covered Mr. Khmaladze's expenses in reliance on the promise to develop a pilot, which then did not come to fruition.  Mr. Vorotyntsev asserts in his affidavit that "Mikhail wanted Dmitry to be comfortable so he could produce, so Shoplink paid for everything in DK's life . . . ."  *Id.* at 8.  As to the third element, Mr. Khmaladze then delivered to Defendants a "crude operational version of ShopLink." *Id.* at 14.  Drawing all permissible inferences in Defendants' favor, a reasonable factfinder could

conclude that the delivery of a "crude operation version" fell short of the promise to complete the pilot, in reliance on which Defendants paid for Mr. Khmaladze's expenses. Accordingly, Plaintiffs are not entitled to summary judgment on this counterclaim.

### H. Conversion Counterclaim

Plaintiffs are entitled to summary judgment on Defendants' conversion counterclaim, because Defendants do not own the software that is the subject of the claim. Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 827 N.Y.S.2d 96, 100 (2006). "The two elements of conversion are '(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.'" *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 178 (E.D.N.Y. 2010) (quoting *Colavito*, 827 N.Y.S.2d at 100).

Defendants have not pointed to evidence that satisfies the first element of the claim, a "possessory right or interest" in the Shoplink Software. *St. John's Univ.*, 757 F. Supp. 2d at 178. As described in Section IV(E), Defendants do not own the copyright to any of the Shoplink Software. Nor have Defendants presented evidence that they had a license or any other rights to the software. Accordingly, Plaintiffs are entitled to summary judgment on this counterclaim.

### I. Unjust Enrichment Counterclaim

Plaintiffs are not entitled to judgment on Shoplink's unjust enrichment counterclaim, because there is evidence that Mr. Khmaladze was enriched at Shoplink's expense. "The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in equity and good conscience should be paid to the plaintiff . . . ." *McCracken v. Verisma Sys.*, 91 F.4th 600, 608 (2d Cir. 2024) (quoting *Corsello v. Verizon N.Y., Inc.*, 944 N.Y.S.2d 732, 740 (2012)). "[U]njust enrichment is

not a catchall cause of action to be used when others fail.  It is available only in unusual situations

when . . . . the defendant, though guilty of no wrongdoing, has received money to which he or she is

not entitled." *Id.* (quoting *Corsello*, 944 N.Y.S.2d at 740).  "To prove an unjust enrichment claim

under New York law, '[a] plaintiff must show that (1) the other party was enriched, (2) at that party's

expense, and (3) that it is against equity and good conscience to permit the other party to retain what

is sought to be recovered.'"  *Eidelman v. Sun Prod. Corp.*, No. 21-1046-CV, 2022 WL 1929250, at *2

(2d Cir. June 6, 2022) (summary order) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 919 N.Y.S.2d

465 (2011)) (alteration in original).

Plaintiffs make only two arguments as to why they are entitled to summary judgment on this

counterclaim, and neither is persuasive.  First, they assert that there is no evidence to support the

second element of the claim, enrichment at Shoplink's expense, because Mr. Khmaladze withdrew

compensation from IT Adapter LLC's bank account rather than Shoplink's.  But Defendants

present evidence that Shoplink paid for some of the benefits Mr. Khmaladze received during the

business relationship:  Mr. Vorotyntsev asserts in his affidavit that Mr. Khmaladze received benefits

"on top of" his salary and that "Shoplink paid for new car for DK's wife, all the DK's house

remodeling, all the new computer equipment, which he wanted to use at his home in his basement

to run tests on.  Shoplink also paid for DK's vacations out of the US, to Mexico and Ukraine, and

for DK's and his wife's parents medical needs and support in Ukraine, amongst other things."

Vorotyntsev Affidavit at 8.  Therefore, Plaintiffs are not entitled to summary judgment on this

ground.

Second, Plaintiffs argue that "an unjust enrichment claim does not permit forfeiture of

compensation for the period of time that Dmitriy remained loyal to the business."  Pl. Mem at 20.

But they cite no authority to support that any such limiting principle applies to unjust enrichment

claims.  Instead, Plaintiffs cite caselaw discussing appropriate restitution for breach of the fiduciary

duty of loyalty. *See Design Strategy, Inc. v. Davis*, 469 F.3d 284, 300-01 (2d Cir. 2006) (analyzing claim for the breach of the duty of loyalty and noting that "New York's lower courts have endorsed limiting forfeiture to compensation paid during the time period of disloyalty").  The Court is not aware, and Plaintiffs do not explain, why this case law is relevant to Shoplink's counterclaim, which does not rest on Mr. Khmaladze's "disloyalty."  Disloyalty or breach of duty is not required to sustain a claim for unjust enrichment, and in fact, an unjust enrichment claim arises where "the defendant, though *guilty of no wrongdoing*, has received money to which he or she is not entitled." *McCracken*, 91 F.4th at 608 (emphasis added).  Because Plaintiffs raise no other arguments regarding this counterclaim, they are not entitled to summary judgment on it.

### A.  Breach of Fiduciary Duty Counterclaims

Plaintiffs are not entitled to summary judgment on Defendants' counterclaim for breach of fiduciary duty, because there is evidence that Mr. Khmaladze breached a fiduciary duty arising from his superior expertise in software development.  "New York law dictates that the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation." *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798 n.3 (2d Cir. 1980).  This rule also applies to limited liability companies ("LLCs"). *See, e.g.*, *In re Hydrogen, L.L.C.*, 431 B.R. 337, 347 (Bankr. S.D.N.Y. 2010) (applying the rule to LLCs) (collecting cases).  Defendant Shoplink is a Delaware corporation and Defendants AUM Code and IT Adapter LLC are Delaware LLCs.  Under Delaware law, "[t]o establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed her a fiduciary duty and that the defendant breached it." *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).  "Fiduciary relationships have often been described as 'special relationships,' for good reason." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006).  "Generally, [a] fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another." *Id.* (quotations

omitted) (alteration in the original).

As to the first element, there is evidence that Mr. Vorotyntsev, on behalf of IT Adapter LLC, "repose[d] a special trust" in Mr. Khmaladze based on his technical expertise, giving rise to a fiduciary duty. *Wal-Mart Stores, Inc.*, 901 A.2d at 113. It is undisputed that Mr. Vorotyntsev hired Khmaladze as CTO of IT Adapter LLC "because he had superior knowledge and expertise in system frameworks for Internet servers." AUM Code Counterclaims ¶ 131. *See Bamford v. Penfold, L.P.*, No. CV 2019-0005-JTL, 2020 WL 967942, at *10 (Del. Ch. Feb. 28, 2020) (holding that "superior knowledge and experience" is an indicator of a fiduciary relationship) (collecting cases). As a result of that expertise, Mr. Vorotyntsev empowered Mr. Khmaladze to decide that the Shoplink pilot should use Mr. Khmaladze's own propriety codebase rather than an "off-the-shelf" code. Vorotyntsev Affidavit at 6. Mr. Khmaladze was also permitted to control access to Assembla, the repository that stored all code, as well as the IT Adapter LLC email account. Khmaladze Dep. 217:8–13; 309:12–16. Vorotyntsev Dep. II 91:15–21; 92:6–16. Drawing all permissible inferences in favor of Defendants, a reasonable factfinder could conclude that Mr. Khmaladze owed Defendants a fiduciary duty based on that relationship of trust.

As to the second element, there is evidence that Mr. Khmaladze breached that duty. As described, there is evidence that Mr. Khmaladze used his control of the IT Adapter LLC email account to block Mr. Vorotyntsev from communicating with his developers. Khmaladze Dep. 217:8–13; 309:12–16. Vorotyntsev Dep. II 91:15–21; 92:6–16. There is also evidence that after insisting on using his proprietary code to develop a pilot, Mr. Khmaladze breached a promise to complete the pilot before severing his relationship with Defendants. Vorotyntsev Affidavit at 14. Drawing all permissible inferences in Defendants' favor, a reasonable factfinder could find that those actions constituted a failure to "protect the interests" of Defendants. *Wal-Mart Stores, Inc.*, 901 A.2d at 113.

Plaintiffs argue that Delaware law categorically bars Mr. Khmaladze from having a fiduciary duty to IT Adapter LLC or AUM Code.  The Court disagrees.  In *In re Sabine Oil & Gas Corp.*, the case relied upon by Plaintiffs, the court rejected the plaintiffs' contention that status as an appointed manager of an LLC gave rise to a fiduciary duty to the LLC.  *In re Sabine Oil & Gas Corp.*, 547 B.R. at 561.  The Court disagrees that this case can be reasonably read to hold that there are no circumstances under which individuals who are neither directors nor managing members of an LLC can have a fiduciary duty to an LLC.  Delaware courts have held that a "special relationship," like the one in this case, can give rise to fiduciary duties to an LLC.  *See, e.g.*, *Coventry Real Estate Advisors, LLC,* N.Y.S.2d 476 at 478 (applying Delaware law and analyzing whether, in light of the fact that the defendant owed no fiduciary duty to the LLC plaintiffs under the operating agreements, "plaintiffs have alleged such a relationship of 'special trust' as to give rise to fiduciary duties"); *Beach to Bay Real Est. Ctr. LLC v. Beach to Bay Realtors Inc.*, No. CV 10007-VCG, 2017 WL 2928033, at *6 (Del. Ch. July 10, 2017), as revised (July 11, 2017) (holding that for the LLC plaintiff to assert a claim for breach of fiduciary "there must be an allegation of an agreement supplying such a duty *or a special relationship creating such a duty*") (emphasis added).[5]

Plaintiffs next argue that there is no evidence of damages resulting from any alleged breach.  But even assuming that this is true, it would not entitle Plaintiffs to summary judgment on this counterclaim.  Under Delaware law, "in a fiduciary duty action, plaintiffs need not plead (or prove at trial) that they have been injured as an element of their claim.  In the absence of sufficient proof of specific injury, the court will issue a declaration that the defendant breached his fiduciary duties and

---

[5] In their reply brief, Plaintiffs assert that "the Court recognized in dismissing Vorotyntsev's counterclaim against Plaintiffs [that] only members of AUM Code LLC and IT Adapter LLC had fiduciary duties to those entities . . . ." Reply at 7.  But this is incorrect.  In its opinion dismissing the Mr. Vorotyntsev's counterclaim, the Court held only that "the counterclaims do not adequately plead that Khmaladze was a manager" of AUM Code who owed "default" duties to the company's members under Delaware law.  The Court did not hold that other circumstances could not give rise to a fiduciary duty to a Delaware limited liability company.

award nominal damages." *Macrophage Therapeutics, Inc. v. Goldberg*, C.A. No. 2019-0137-JRS, memo. op. at *53 (Del. Ch. June 23, 2021) (internal quotations and citations omitted). Accordingly, Plaintiffs are not entitled to summary judgment on Defendants' breach of fiduciary duty counterclaim.

### B. Shoplink's Unfair Competition Counterclaim

Plaintiffs are entitled to partial summary judgment on Shoplink's counterclaim for civil conspiracy to commit unfair competition, because there is evidence that Plaintiffs misappropriated Defendants' product idea, as well as poached Defendants' software developers and blocked Mr. Vorotyntsev's ability to communicate with them. Under New York law, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." *Abacus Fed. Sav. Bank v. Lim*, 905 N.Y.S.2d 585, 588 (1st Dep't 2010) (quoting *Alexander & Alexander of N.Y. v Fritzen*, 68 N.Y.2d 968, 969 (1986)). Therefore, under New York Law, to prevail on a claim for civil conspiracy, the claimant "must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Id.* (quoting *World Wrestling Fed'n Ent., Inc. v. Bozell*, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001)).

Here, the primary tort is unfair competition. New York courts "have long recognized two theories of common-law unfair competition: palming off and misappropriation." *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007). As described below, Shoplink raises four theories of unfair competition, each based on misappropriation. An unfair competition claim involving misappropriation requires the claimant to "establish that the [the other party]: (1) 'misappropriated the [claimant's] labors, skills, expenditures, or good will'; and (2) 'displayed some element of bad faith in doing so.'" *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 284 (S.D.N.Y. 2016)

(quoting *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 446 (E.D.N.Y. 2011)); *see also Schroeder v. Pinterest Inc.*, 17 N.Y.S.3d 678, 693 (1st Dep't, 2015) (holding that a claim for unfair competition requires proof that "the defendant misappropriated the plaintiff's labor, skills, expenditures or good will, and displayed some element of bad faith in doing so"). "In this context, bad faith can be established by a showing of fraud, deception, or an abuse of a fiduciary or confidential relationship." *Schroeder*, 17 N.Y.S.3d at 693.

Defendants articulate four theories of unfair competition:  1) misappropriation of the Shoplink Software, 2) misappropriation of the Shoplink business model, concept, and other unspecified trade secrets, 3) poaching of Shoplink's clients, and 4) poaching of Defendants' software developers.  Defendants address only the first theory in their brief, and only the first and second were referenced in their counterclaims.  The other two theories appear for the first time in their Rule 56.1 Statement.  Nonetheless, the Court addresses each theory.

First, Plaintiffs are entitled to summary judgment on Defendants' theory of misappropriation of the Shoplink Software because, as described, the Court has determined that Shoplink does not own any of the Shoplink Software.  A claim for unfair competition by misappropriation "will fail where a [claimant] cannot demonstrate 'the bad faith misappropriation of a commercial advantage which belonged exclusively to him.'"  *Big Vision Private, Ltd. v. E.I. DuPont de Nemours & Co.*, 610 F. App'x 69, 70 (2d Cir. 2015) (summary order) (quoting *LoPresti v. Mass. Mut. Life Ins. Co.*, 820 N.Y.S.2d 275, 277 (2d Dep't 2006)).

While Shoplink's lack of ownership is fatal to this theory of the counterclaim, Defendants have also failed to present evidence that Plaintiffs used the Shoplink Software to build Agnicore. Plaintiffs have presented evidence that Mr. Khmaladze's company Agnicore used a "different code base, different build, different framework, different . . . structure" than Shoplink.  Khmaladze Dep. 307:16–308:25.  Instead of presenting evidence that contradicts that evidence or otherwise shows

that Agnicore used the Shoplink software, Defendants counter with unsubstantiated speculation. They argue in their Rule 56.1 Statement that it would not have been possible for Agnicore to have used a different code base because "how it could [sic] be developed in a few weeks (because Khmaladze had been working on it for at least three years at Shoplink.)" Def's Counterstatement ¶ 55. As an initial matter, Defendants have failed to present any evidence that Agnicore was "developed in a few weeks." *Id.* Defendants also offer no evidence to support the inference that Agnicore used the same codebase as Shoplink. A non-movant cannot defeat summary judgment by relying on "unsubstantiated speculation." *Fujitsu Ltd.*, 247 F.3d at 428 (quoting *Scotto*, 143 F.3d at 114). Accordingly, Plaintiffs are entitled to summary judgment on this theory of unfair competition.

Second, Plaintiffs are not entitled to summary judgment on Defendants' theory of unfair competition based on alleged misappropriation of the Shoplink concept because there is evidence that Defendants' misappropriated the idea for Monetize Your Influence. With respect to the first element of the claim, misappropriation, Defendants have pointed to evidence that Plaintiffs' company Agnicore "launch[ed] an identical Shoplink product" called Monetize Your Influence, Vorotyntsev Affidavit at 19, and evidence that Shoplink's product idea was "unknown to the general public . . . ." Vorotyntsev Dep. II 50:6–16. With respect to the second element of the claim, bad faith, Mr. Khmaladze had access to that allegedly confidential product idea because of his "fiduciary or confidential relationship" with Defendants. *Schroeder*, 17 N.Y.S.3d at 693. Drawing all permissible inferences in favor of Defendants, this evidence is sufficient to defeat summary judgment on this theory of the counterclaim.

Plaintiffs argue that because Shoplink's patent was made publicly available in 2014, it did not have any trade secrets. Shoplink Counterclaims ¶ 27; Aum Code Counterclaims ¶ 27. But Plaintiffs have not argued, nor do they present evidence, that the patent described the allegedly misappropriated product idea. Plaintiffs also argue that Defendants have not shown evidence of

misappropriation because it is undisputed that Agnicore used "different code base, different build, different framework, different . . . structure" than Shoplink. Khmaladze Dep. 307:16–308:25. But the fact that the two products did not rely on the same software does not establish that they did not rely on the same idea or concept. Therefore, Plaintiffs are not entitled to summary judgment on this theory of the counterclaim.

Third, Plaintiffs are entitled to summary judgment on Defendants' theory of unfair competition based on the alleged poaching of Shoplink's client Readerlink, because Defendants have not presented evidence that supports the second element of the claim, that Plaintiffs "displayed some element of bad faith in doing so." *Apple Mortg. Corp.*, 162 F. Supp. 3d at 284. Agnicore formed a relationship with Readerlink after an introduction from Mr. Zubchevich, who had a pre-existing relationship with Readerlink and was in fact the one who connected Defendants with Readerlink in the first place. Khmaladze Dep. at 123:3–4; 316:10–317:6. Defendants do not present any evidence, nor do they even argue, that Plaintiffs acted in bad faith in the course of securing Readerlink as a client, as required to satisfy the second element of a claim for unfair competition. *Apple Mortg. Corp.*, 162 F. Supp. 3d at 284. Accordingly, Plaintiffs are entitled to summary judgment on this theory.

Finally, Plaintiffs are not entitled to summary judgment on Defendants' fourth theory of unfair competition, based on employee poaching, because there is evidence that Plaintiffs poached Defendants' developers and acted in bad faith in doing so. As to the first element of the counterclaim, misappropriation of a commercial advantage, it is undisputed that Plaintiffs hired some of Defendants' software developers to work at Agnicore after they had worked on the Shoplink pilot. Khmaladze Dep. 83:14–24. As to the second element of the counterclaim, bad faith, Defendants have presented evidence that after severing his relationship with Defendants and before hiring the software developers, Mr. Khmaladze prevented Mr. Vorotyntsev from

communicating with the developers by blocking him from the IT Adapter LLC email account. Vorotyntsev Dep. II 124:16–24. As discussed, a reasonable factfinder could conclude that such conduct amounts to "an abuse of a fiduciary or confidential relationship." *Schroeder*, 17 N.Y.S.3d at 693. Drawing all permissible inferences in favor of Defendants, this evidence is sufficient to defeat summary judgment on this counterclaim. *Cf. Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17CIV4819GBDBCM, 2020 WL 3429775, at *5 (S.D.N.Y. June 23, 2020), *aff'd in part and remanded*, 838 F. App'x 588 (2d Cir. 2020) (summary order) (holding that defendant's poaching of employees, which breached a contract, satisfied the elements of an unfair competition claim).

Plaintiffs' attempt to counter the evidence of bad faith fails to establish the absence of a genuine dispute of fact on this issue. Plaintiffs cite Mr. Khmaladze's deposition testimony, in which he stated that Mr. Vorotyntsev "had all of the connections to the developers, he had the bank account, he had everything . . . ." Khmaladze Dep. 324:14–16. Even to the extent that this testimony contradicts Mr. Vorotyntsev's assertion that Mr. Khmaladze prevented him from communicating with the developers, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson*, 680 F.3d at 236. Therefore, Mr. Khmaladze's testimony does not entitle Plaintiffs to summary judgment on this counterclaim.

Plaintiffs also argue that they are entitled to summary judgment on all theories of this counterclaim because "ShopLink has not established any damages from any alleged unfair competition." Pl. Mem. at 15. They assert that under New York Law "the damages for unfair competition are limited to the loss of profits sustained by reason of the improper conduct." *Id.* (internal quotations omitted). But even assuming that Defendants have not presented evidence of damages, that does not entitle Plaintiffs to summary judgment on this counterclaim. Under New York law, "nominal damages will be awarded to a plaintiff where the law recognizes a technical

invasion of [its] right or a breach of defendant's duty, but where the plaintiff has failed to prove actual damages or a substantial loss or injury to be compensated." *Weiss v. Miller*, 564 N.Y.S.2d 110 (1st Dep't 1990) (upholding award of nominal damages in unfair competition claim), *aff'd*, 78 N.Y.2d 979 (1991); *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 321 (S.D.N.Y. 2008) (noting that "New York courts have granted nominal damages for unfair competition claims") (collecting cases). Accordingly, this argument does not entitle Plaintiffs to summary judgment on this counterclaim. Defendants' theory of unfair competition based on poaching of employees survives.

### C. Tortious Interference

Plaintiffs are entitled to summary judgment on Shoplink's counterclaim for conspiracy to commit tortious interference, because Defendants have not presented competent evidence of any interactions between Mr. Khmaladze and Shoplink investors other than Mr. Tatintsian, or that Mr. Khmaladze directed any such interactions. In addition to the elements of civil conspiracy, stated above, a claim for conspiracy to commit tortious interference requires proof that "(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Scutti Enters. v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002)).

Defendants have not presented evidence that supports the second or third elements of the counterclaim. In their Rule 56.1 Statement, Defendants assert two theories of the counterclaim. First, they assert Mr. Zubchevich, at Mr. Khmaladze's direction, "call[ed] Shoplink's investors and harass[ed] them for 18 months." Def's Counterstatement ¶ 171. Second, they assert that Mr. Khmaladze "lied to and harassed" Shoplink's "potential vendor-clients." *Id.* ¶¶ 175–176. But

Defendants have not pointed to competent evidence to support either of those factual assertions. Defendants cite only Mr. Vorotyntsev's affidavit, which mentions just two communications between Mr. Khmaladze's associates and Shoplink's investors or potential clients. First, the affidavit states that Mr. Zubchevich "call[ed] and harass [ed]all the Shoplink shareholders, telling them that Mikhail stole money and was being sued by Gary and sending all investors TRO and complaints of the suit, and asking them to join Gary's action." Vorotyntsev Affidavit at 19. Second, it states that "Gary Tatintsian ha[d] someone call" a potential Shoplink investor "and inform them that Shoplink's technology is in federal court and is being contested and that MV is investigated criminally by NYAG office." *Id.* at 20.

    As an initial matter, because it does not appear from his affidavit that Mr. Vorotyntsev has personal knowledge of those alleged interactions between third parties, his affidavit is not competent evidence that they occurred. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *U.S. Small Bus. Admin. v. Feinsod*, No. 17-CV-3586(JS)(JMW), 2023 WL 6385814, at *3 (E.D.N.Y. Sept. 29, 2023) (striking a portion of an affidavit from the summary judgment record "because such matters do not appear to be based on [the affiant's] personal knowledge").

    But even if Mr. Vorotyntsev's affidavit were competent evidence that Mr. Tatintsian or Mr. Zubchevich interfered with Shoplink's investors or clients, Defendants have not pointed to evidence that supports the conclusion that either Mr. Khmaladze was involved in or even aware of those communications, or that they were part of a civil conspiracy involving Mr. Khmaladze. Defendants assert in their Rule 56.1 statement that Mr. Khmaladze "ordered, managed, directed, and/or controlled" the communications. Def's Counterstatement ¶ 171. But once again, Defendants cite only Mr. Vorotyntsev's affidavit, and no portion of the affidavit provides any support for that

statement.[6]  The Court reiterates that a Rule 56.1 statement "is not itself a vehicle for making factual assertions that are otherwise unsupported in the record."  *Holtz,* 258 F.3d at 74.  Accordingly, Plaintiffs are entitled to summary judgment on this counterclaim.

### D.  Shoplink's Counterclaim for Breach of the NDA

Plaintiffs are entitled to summary judgment on Shoplink's counterclaim for breach of the NDA, because Defendants have not presented evidence that Mr. Khmaladze shared any confidential information with Mr. Tatintsian except at Mr. Vorotyntsev's direction.  As an initial matter, it is undisputed that Mr. Vorotyntsev instructed Mr. Khmaladze to disclose information about Shoplink to Mr. Tatintsian.  On August 23, 2016, Mr. Vorotyntsev emailed Mr. Tatintsian, copying Mr. Khmaladze, stating that "[Mr. Khmaladze] will stand by for a conversation with you tomorrow and will walk you through the demo and explain if necessary where we are with respect to our timetable."  Dkt. No. 276-6.  Mr. Vorotyntsev also forwarded Mr. Tatintsian login information for the Shoplink demos, as well as the "vendor set up manual."  *Id.*  See also Dkt. No. 276-9.

Defendants' theory of breach is based on one phone call and one in-person conversation between Mr. Khmaladze and Mr. Tatintsian that occurred the following month, in September 2016.  Def's Counterstatement ¶ 141 (citing Khmaladze Dep. 203:7–22; 206:11–207:16; 208:16–17).  Defendants have not presented evidence that supports the conclusion that either of those conversations breached the NDA.  With respect to the phone conversation, Defendants have not presented any evidence regarding its content or the topics discussed.  In the deposition testimony cited by Defendants, Mr. Khmaladze stated only that he "had a conversation with Mr. Tatintsian when Mr. Vorotyntsev asked us to have a conversation" and that "Mr. Vorotyntsev said, yeah, take a call from [Mr. Tatintsian] today, he's going to call you, don't worry, blah, blah, blah . . . ."

---

[6] Defendants also argue that "Plaintiff participated in the civil conspiracy on a general level by being a coowner [sic], responsible for the acts of underlings," Def's Counterstatement ¶ 174, but they do not cite any record evidence to support this assertion.  Therefore, the Court disregards this assertion.  *See Holtz,* 258 F.3d at 74.

Khmaladze Dep. 203:11–13; 206:25–207:3.  Therefore, Defendants have not presented evidence that the phone conversation breached the NDA.

With respect to the in-person conversation, it is undisputed that Mr. Khmaladze discussed the Shoplink pilot and its progress, two topics within the scope of what Mr. Vorotyntsev authorized Mr. Khmaladze to share with Mr. Tatintsian in his August 23, 2016 email.  Therefore, Defendants have not presented evidence that the in-person conversation breached the NDA.  Outside of those two conversations, Defendants have not presented evidence that Mr. Khmaladze disclosed confidential information on any other occasion.  Accordingly, Plaintiffs are entitled to summary judgment on Shoplink's counterclaim for breach of the NDA.

### E.  Shoplink's Counterclaim for Declaratory Judgment Regarding the NDA

Finally, Plaintiffs are entitled to summary judgment on Defendants' counterclaim for declaratory judgment regarding the non-compete and non-solicitation provisions of the NDA, because Defendants have abandoned this counterclaim.  Plaintiffs argue that the provisions are unenforceable because they are overly vague and broad.  Because Defendants do not respond to this argument or even mention this counterclaim in their papers, the Court deems this counterclaim abandoned.  *See Jackson*, 766 F.3d at 196.  Accordingly, Plaintiffs are entitled to summary judgment on this counterclaim.

## V.    CONCLUSION

For these reasons, Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part.  Summary judgment is GRANTED as to Plaintiff's claim for declaratory judgment that Defendants materially breached the Asset Purchase Agreement, rescission of the Asset Purchase Agreement, and a final judgment regarding the non-enforceability of the non-compete and non-solicitation provisions of the Asset Purchase Agreement, as well as to Defendants' counterclaims for breach of contract, breach of the Asset Purchase Agreement, breach of the NDA,

conversion, conspiracy to commit tortious interference, and both of Defendants' counterclaims for declaratory judgment. Summary judgment is DENIED as to Defendants' counterclaims for conspiracy to commit unfair competition, unjust enrichment, promissory estoppel, and breach of fiduciary duty. The Clerk of Court is directed to terminate the motion pending at Dkt. No. 262.

     SO ORDERED.

Dated: August 6, 2024

                                            _____
                                            GREGORY H. WOODS
                                      United States District Judge